

# CASE NO. 2:23-CV-00066-DCR

## SEAN DAVIS

## V.

## CITY OF COVINGTON, ET AL.

## DEPONENT:

## MICHAEL LUSARDI

## DATE:

### December 14, 2023

✉ schedule@yourdepos.com

☎ 866.800.7031



```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF KENTUCKY

 3                     COVINGTON DIVISION

 4              CASE NO. 2:23-CV-00066-DCR

 5

 6                      SEAN DAVIS,

 7                        Plaintiff

 8

 9                           V.

10

11              CITY OF COVINGTON, ET AL.,

12                       Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT: MICHAEL LUSARDI

24   DATE:      DECEMBER 14, 2023

25   REPORTER: OLIVIA M. DOSKER
```

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 2

                              APPEARANCES

1

2

3    ON BEHALF OF THE PLAINTIFF, SEAN DAVIS:

4    Anita M. Washington, Esquire

5    Khadeem Gibson, Esquire

6    Bey & Associates, LLC

7    312 Elm Street

8    Suite 1485

9    Telephone No.: (513) 547-4010

10   E-mails: anita@beyandassociates.com

11   khadeem@beyandassociates.com

12

13   ON BEHALF OF THE DEFENDANTS, CITY OF COVINGTON AND

14   MICHAEL LUSARDI:

15   Jeffrey C. Mando, Esquire

16   Adams Law, PLLC

17   40 West Pike Street

18   Covington, Kentucky 41011

19   Telephone No.: (859) 495-3798

20   E-mail: jmando@adamsattorneys.com

21

22

23

24

25

Page 4

1                             INDEX

2                                                          Page

3    DIRECT EXAMINATION BY MS. WASHINGTON                   6

4

5

6                             EXHIBITS

7                                                          Page

8    1 - KYIBRS Report: Narrative                          58

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2                      APPEARANCES (CONTINUED)

3

4    ON BEHALF OF THE DEFENDANT, CITY OF COVINGTON:

5    Sheree Weichold, Esquire

6    City of Covington

7    20 West Pike Street

8    Covington, Kentucky 41011

9    Telephone No.: (859) 292-2318

10   E-mail: sheree.weichold@covingtonky.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                             STIPULATION

2

3    The deposition of MICHAEL LUSARDI was taken at ADAMS

4    LAW, PLLC, 40 WEST PIKE STREET, COVINGTON, KENTUCKY

5    41011 on THURSDAY the 14th day of DECEMBER 2023 at 10:09

6    a.m. (ET); said deposition was taken pursuant to the

7    FEDERAL Rules of Civil Procedure.

8

9    It is agreed that OLIVIA M. DOSKER, being a Notary

10   Public and Court Reporter, may swear the witness

11   and that the reading and signing of the completed

12   transcript by the witness is not waived.

13

14

15

16

17

18

19

20

21

22

23

24

25

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 6

```
 1                     PROCEEDINGS
 2
 3          THE REPORTER:  We are now on the record. Mr.
 4    Lusardi, will you please raise your right hand?  Do
 5    you solemnly swear or affirm that the testimony
 6    you're about to give will be the truth, the whole
 7    truth, and nothing but the truth?
 8          THE WITNESS:  I do.
 9          THE REPORTER:  Thank you.  You may begin.
10                  DIRECT EXAMINATION
11    BY MS. WASHINGTON:
12       Q.   Good morning, Mr. Lusardi.  Thank you for
13    being here this morning.  We briefly introduced
14    ourselves before we got started, but my name is Anita
15    Washington.  And I, along with Khadeem Gibson, we
16    represent Sean Davis in this case.  And I'm going to be
17    asking you a set of questions today, and I only want
18    answers that you have personal knowledge of.  This is
19    not a test.  This is not a trick.  If you don't know the
20    answer, just tell me you don't know.  Have you had your
21    deposition taken before?
22       A.   Yes, ma'am.
23       Q.   You have?  I -- I wo -- in -- for -- in the
24    process of your duties with City of Covington?
25       A.   Different cases.  Is that -- is that what you
```

Page 7

```
 1    mean?
 2       Q.   Right.
 3       A.   Yeah.
 4       Q.   But I mean it, in your capacity as an officer
 5    for Covington?
 6       A.   Yes.  I --
 7       Q.   Okay.  Have you ever had your deposition taken
 8    outside of that capacity?
 9       A.   No, ma'am.
10       Q.   Okay.  And so I -- I'm sure that you're aware
11    of the rule, so I'll just be really brief.  I speak
12    loudly.  You should probably have no trouble hearing me.
13    But if you do, please ask me to repeat the question and
14    I will.  If you don't understand the question, which is
15    possible, please ask me and I'll rephrase it.  If you
16    don't know the answer, please just tell me you don't
17    know, okay?
18       A.   Yes, ma'am.
19       Q.   I'm usually pretty brief, but if you need a
20    break, absolutely not a problem.  I just ask that you
21    answer the question that's on the table.  Then we can
22    take a break.  Whether you need to go tend to Duke, you
23    know, whatever it is you need to do, we can take a
24    break.  And -- but if you answer my questions, I will
25    assume you understood the question; is that fair?
```

Page 8

```
 1       A.   Yes, ma'am.
 2       Q.   Okay.  Do you have any questions for me before
 3    we get started?
 4       A.   No, ma'am.
 5       Q.   Okay.  Can you state your full name for the
 6    record?
 7       A.   Michael Vincent Lusardi.
 8       Q.   And Mr. Lusardi --
 9       A.   What?
10       Q.   -- where are you currently employed?
11       A.   City of Covington.
12       Q.   And where were you employed on June 9th, 2022?
13       A.   City of Covington.
14       Q.   Mr. Lusardi, we are here today to talk about
15    some incidents that occurred around the late night,
16    early morning on June 9th, 2022.  If I ever say on the
17    date of incident, I will be referring to that date and
18    no other.  I will be talking about the location behind -
19    - I believe it's Rizzo's, where Sean Davis was
20    encountered.  So I'll be talking about the location.  If
21    I'm ever talking about any other location, hopefully I
22    will make that click to you.
23       A.   Yes, ma'am.
24       Q.   Okay?  And so Mr. Lusardi, how long have you
25    been an officer?
```

Page 9

```
 1       A.   19 years.
 2       Q.   Has all of that been with Covington?
 3       A.   Yes, ma'am.
 4       Q.   So that we're on the same level, I'm probably
 5    going to get a few terminology out of the way so when
 6    we're talking, we're on the same understanding of these
 7    definitions.  Mr. Lusardi, if you know, what is an EPO?
 8       A.   Emergency protection order.
 9       Q.   And when is that issued?
10       A.   I would believe after a -- a judge -- a party
11    files a complaint, a judge signs it.
12       Q.   Is there any difference between an EPO and a
13    DVO?
14       A.   A domestic violence order versus a emergency
15    protection order?
16       Q.   Yes, sir.  Is there any difference between the
17    two?
18       A.   Maybe the regulations.
19       Q.   And what do you mean by that, sir?
20       A.   As far as being around the other party, or
21    whatever the judge sets, if there's kids involved.
22    That's my understanding, I guess.
23       Q.   Okay.  And so an EPO would -- is that
24    something that would last, like, be in place for six
25    months or a year, or do you know?
```

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 10

1    A.    I believe it's two years, or it can be
2  extended or renewed.
3    Q.    Okay.  So now, so -- and I'm glad we're doing
4  this, because my understanding is different.  My
5  understanding is an EPO is an emergency protective order
6  that's granted for, like, the first 14 days.  And then
7  after a hearing, it becomes a DVO.  Is that probably --
8    A.    Okay.  Yes, ma'am.
9    Q.    Okay.  Is -- but that is -- is that your
10  understanding as well?
11    A.    Yes, ma'am.
12    Q.    Okay.  Does Kentucky have a definition of a
13  suspicious person, what is a suspicious person?
14    A.    Legally, I don't have it in front of me, no.
15    Q.    Have -- are you aware of any best practices
16  for approaching a suspicious person?
17    A.    If -- if I -- getting out with a -- subject
18  that I think is suspicious?  Is that what you're...
19    Q.    Yes, sir, for approaching a person that you --
20  you've already determined is suspicious.
21    A.    Oh.  I --
22    Q.    Is there any best practice for approaching
23  that person?
24    A.    Depends on the -- the call, as far as
25  description of how he's acting, if it's narcotic-

Page 11

1  related or if it's violent, in the street or something
2  like that, yes.  There -- there's different ways of
3  approaching that.
4    Q.    Okay.  Can you just tell me a few?
5    A.    So if he's in the middle of a -- a street,
6  definitely do not pull right up to him if he's violent.
7  We usually kind of approach tactfully, I guess, to put
8  us -- ourselves in a better position.  Say as, you know,
9  someone that is acting under the influence of narcotics,
10  we definitely don't want to -- like, our lights and
11  stuff like that.  Different techniques, I guess, coming
12  in that way.
13    Q.    Okay.  Also, what does it mean to be detained?
14    A.    Detained is not free to leave.
15    Q.    Is there any difference between being detained
16  and being arrested?
17    A.    Yes, ma'am.  In my eyes, I believe that you --
18  you're being detained until I -- I lose probable cause.
19    Q.    I'm sorry.  Did you say until you lose?
20    A.    Yes.
21    Q.    So that I'm clear, does that -- then,
22  does a detainment go toward arrest if you --
23    A.    If I -- yeah.
24    Q.    -- have probable cause?  And then if you
25  don't, the detainment goes to the person being free?

Page 12

1    A.    Yes, ma'am.
2    Q.    Okay.  For what purposes are people detained?
3    A.    Traffic stops, narcotic investigations, for
4  me.  Let's see, if any kind of, you know, violent crime
5  or -- crimes in progress, stuff like that.
6    Q.    Okay.  So that I'm clear, you said until you
7  lose probable cause.  So, can we just kind of summarize
8  that all up to say a person is detained while you
9  conduct your investigation?
10    A.    Yes, ma'am.
11    Q.    Would that be correct?  Okay.  And if your
12  investigation determines what you had probable cause
13  for, you go through with the arrest.  If it doesn't, the
14  person is free?
15    A.    Yes, ma'am.
16    Q.    Okay.  During that investigative detainment,
17  is the person free to leave?
18    A.    No, ma'am.  As far as -- until we figure out
19  what's going on.
20    Q.    Not until what we just talked about?
21    A.    Yes, ma'am.
22    Q.    Are they normally handcuffed?
23    A.    Depending on the situation, yes.
24    Q.    Are they -- I guess the word is frisked -- or
25  is their body searched for weapons or...

Page 13

1    A.    Most time, you can pat them down.
2    Q.    Pat?  Okay.  If they're near their homes, are
3  their homes searched?
4    A.    No -- no, ma'am.
5    Q.    Do you know -- is -- is -- is there a length
6  of time that a suspect can be detained?
7    A.    As long as there's continuous activity as far
8  as investigating.
9    Q.    Continuous.  Would you agree it's temporary
10  and shouldn't last past the investigatory period?
11    A.    Yes, ma'am.
12    Q.    Are detainments considered seizures under the
13  law, if you know?
14    A.    I'm not positive on that one.
15    Q.    Okay.  And you said you've been a police
16  officer for 17 years?
17    A.    19.
18    Q.    19?
19    A.    Yes, ma'am.
20    Q.    I'm trying to lengthen your time to work here
21  before retirement, sorry about that.  And I assume you
22  had to have training?
23    A.    Yes, ma'am.
24    Q.    Can you tell me about that?
25    A.    I went to Kentucky Police Corps, which is down

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 14

1   in -- used to be down in Richmond.  The program's no
2   more any -- let's see, I went through 23 weeks of basic
3   academy and training and graduated then, 2004.  I went
4   through, I want to say, ballpark 18 to 20 weeks of field
5   training officer, which consists of first shift, having
6   a FTO, which is a kind of supervisor in my car.  Then, I
7   went to second shift for period of time.  Then I went to
8   third shift.  And then I went back to seconds, and got
9   cut loose, which I got released to the street, solo
10  patrol.
11      Q.   Without the FTO?
12      A.   Yes, ma'am.
13      Q.   Okay.
14      A.   And then as far as other training, I have
15  yearly training through the PD.  And through DOCJT, we
16  have to do 40 hours a year for CALEA.  And -- so it's
17  either online or we do -- you can go to Richmond or you
18  can go to Boone County.  And then now they have a
19  Chief's Association where they have classes here, okay.
20  So...
21      Q.   When's the last time you've had your
22  continuous training?
23      A.   It was either first week October, or the last
24  week of September, this year.
25      Q.   Did you take that in-person or online?

Page 15

1   A.   In-person.
2   Q.   Do you remember what kind of topics you guys
3   went over?
4   A.   It was Kentucky drug investigation.
5   Q.   During any of that training that you just
6   mentioned, whether it was through the basic, the FTO, or
7   the continuing education, did you ever do any training
8   on report writing?
9   A.   Not in that class, no.  No, ma'am.
10  Q.   Okay.  In any of those classes that you
11  mentioned to me as far as training, did you ever have
12  any course or -- even a course, but just any type of
13  training on report writing?
14  A.   Through the academy?  Yes, ma'am.
15  Q.   Through the academy.  Do you remember, was
16  that like a one-day course or just, like, one little
17  class or how did that go?
18  A.   I don't -- I -- I'm not real positive --
19  Q.   Okay.
20  A.   -- so -- I mean, it was a -- it was a decent
21  amount of time.
22  Q.   And even if you don't remember the course
23  itself, do you know if you were trained to be thorough
24  and accurate in your reports?
25  A.   Yes, ma'am.

Page 16

1   Q.   Were you trained -- or in your duties as an
2   officer, you have the need to write reports on a daily
3   basis.  Would that be correct?
4   A.   Yes, ma'am.
5   Q.   Okay.  And when you write those reports, are
6   those reports from your own memory?
7   A.   Yes, ma'am.
8   Q.   Do you ever write reports -- or would you ever
9   author a report that was not your own?  In other words,
10  that was written by someone else, their observations as
11  your own?
12  A.   Oh.  No, ma'am.
13  Q.   Okay.  I think that was going to be a bad
14  question, but we got it together.
15  A.   You got it, ma'am.
16  Q.   Yeah.  And so would you ever use verbatim
17  words or verbatim phrases from someone else's report?
18  A.   No, ma'am.
19  Q.   Okay.  Let's talk about Duke.  Can you -- how
20  long have you had Duke?
21  A.   I've had -- 20 -- it was 2020 when I got him.
22  Q.   Do you know how old he was when you got him?
23  A.   He was about a year and a half.  He was born
24  12-10, I believe '18.
25  Q.   Oh, he just had a birthday, huh?

Page 17

1   A.   Yes, ma'am.
2   Q.   Had you been a handler prior to having Duke?
3   A.   Yes, ma'am.
4   Q.   Who -- what was that dog's name?
5   A.   Ernie.
6   Q.   How long did you have Ernie?
7   A.   I had about nine, ten years.  It's a...
8   Q.   I think I know, but what happened to Ernie?
9   A.   He got shot.
10  Q.   Okay.
11  A.   Yeah.  If the -- that story again, we got hit
12  by a -- a drunk driver on the interstate.  Let's see,
13  we've been in several incidences, so...
14  Q.   So he re -- just retired?
15  A.   He re -- yes, he had surgery and it went okay.
16  I retired him, and then he died on January 29th.  And
17  then I -- I had Duke and started working Duke.
18  Q.   Okay.  I'm sorry to hear that.
19  A.   Okay.
20  Q.   But I thought I knew Ernie, because I thought
21  they made a really big deal about him after he had his
22  surgery, right?
23  A.   Yes, ma'am.  Yeah.
24  Q.   Okay.
25  A.   Yeah.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 18

1    Q.   And did you take him home with you?
2    A.   Yes.  Yes.  Sure did.
3    Q.   Okay.  Well, I'm sorry for your loss.  I know
4  they're like family.
5    A.   Yes, ma'am.
6    Q.   So he was 1 and a half.  Was Duke a green dog,
7  or was he titled when you got him?
8    A.   He was green.
9    Q.   Tell me about the training to take him from
10 being green to being -- now, the -- is he certified?
11   A.   Yes, ma'am.
12   Q.   Okay.  So tell me about the training to take
13 him from being a green dog to being a certified.
14   A.   All right.  We -- so we used to have a club,
15 Great -- Great American Schutzhund Club -- over
16 Cincinnati.  It's -- it used to be out in Verona and the
17 vendor there, his name was Tom Hulesman, he passed away.
18 And I would go out there for about 100 hours or so and
19 train with him.  Training consisted of obedience,
20 tracking, building searches, area searches. Let's see,
21 article searches.  I did the narcotics myself on him,
22 and then with -- through about 100 hours or so in
23 narcotics.  Once he was good to go, I took him to
24 Jeffersonville, Indiana, where I certified through North
25 American Police Working Dog Association.  That was

Page 19

1  around February, March of that ye -- or -- or '19, I
2  believe.
3    Q.   Certification, so is it a test?  Do you go and
4  take a test, or how do you get certified?
5    A.   So there is a -- they're called master
6  trainers, which is through the organization.  Everything
7  is blind, meaning I don't know anything about it.  For
8  instance, if it's a track, the track will -- in the
9  bylaws, it will consist of a quarter mile.  It'll be two
10 surface changes with three turns.  The -- there will be a
11 ball at the end.  The track can age from 45 minutes to
12 an hour.  It's under the discretion of the master
13 trainer where -- and then we'll do that.  Then -- or say
14 a building search.  It'll be a bad guy -- or decoy,
15 sorry, in a -- in a room.  The dog will have to locate
16 the decoy and bark on the door.  There's protection work
17 where the dog is sent and then he's downed, that I'll
18 return back to the handler.  There's gunfire where the
19 dog has to stay in the down or sit.  There's a bite
20 where you send the dog to bite the decoy.  He outs.  You
21 have to move the decoy back, move him around a little
22 bit, and then pat him down.  And then go -- return back
23 to your dog.  There's obedience where it consists of off-
24 leash obedience.  Heeling, where it's two left turns,
25 two right turns, two about turns.  There's a verbal hand

Page 20

1  signals, sitting down, a three-minute long down.  The --
2  let's see, the article search is basically there's
3  several articles in a 60 by 60 area, depending on grass
4  or vegetation, it's fine.  Just you can run him on-
5  lease or off-leash, and you go -- you have to find two
6  within five minutes.
7    Q.   Okay.
8    A.   Narcotics, I -- me to keep going?  I don't
9  know if I've answered that --
10   Q.   No, that's -- that -- yeah.  So how often is
11 certification given?
12   A.   We certify every year.
13   Q.   Okay.  And the test to be certified, how often
14 is that given, for the initial certification?  Like, if
15 you had a dog today that you wanted to certify, is there
16 -- does -- is it once a week?  Once a month?
17   A.   So we will -- we'll contact a -- master
18 trainers throughout the -- our region, I guess.
19   Q.   I see.
20   A.   And -- so -- or for instance, like, tomorrow,
21 I'm taking a dog to go to Fort Wayne to get certified,
22 so...
23   Q.   Okay.
24   A.   You know, it just depends on their
25 availability, because they're police officers as well,

Page 21

1  or they're retired, so...
2    Q.   Okay.  Did Duke pass on the first
3  certification?
4    A.   Yes, ma'am.
5    Q.   Okay.  Because he was ready in January, right?
6  But he didn't get certified until March, so why --
7    A.   I --
8    A.   -- is that?
9    A.   -- I want to say it was probably February,
10 because of -- I did the narcotics first and then I went
11 and did the patrol work, because you -- you can split
12 them up.  So it's a long day as far as --
13   Q.   Right.
14   A.   -- doing everything in one day.
15   Q.   Yeah, I was getting the January date from the
16 January 23rd e-mail that said that Duke had successfully
17 completed his basic patrol dog school.
18   A.   Okay.
19   Q.   And is qualified to perform as a working
20 patrol dog team.  So would he have needed any other
21 training after that e-mail?
22   A.   No, ma'am.
23   Q.   Okay.  So that was January 23rd.  So he didn't
24 get certified in January, all of February, and the
25 beginning of March?

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 22

1    A.   Can I ask you what -- who wrote the e-mail?  I
2  can tell you --
3    Q.   Yeah.
4    A.   -- if it's --
5    Q.   Absolutely.  Tom Hulesman?
6    A.   Yes, ma'am.  Okay.  So he is the vendor where
7  I got the dog, and that's where I completed the 100
8  hours.  So he wasn't certified.  He just says, hey, I'm
9  done with him.  He's good to go.  And then I go to
10 NAPWDA, North American Police Working Dog Association.
11   Q.   Okay.
12   A.   Then, I get him certified.  So I -- with Tom,
13 he's not certified.  So it's just saying, we
14 successfully completed the 100 hours of training.
15   Q.   Okay.  So between the time he completed in
16 January and the time he was certified in March, what
17 would he have been doing during that time?
18   A.   So we would work on the certification and
19 doing -- let's see, different training as far as
20 confidence in the dog.  If there's but he's not
21 deployable.  For our standards, we like -- like him to
22 be certified before he is deployable.
23   Q.   Okay.  So you had Ernie prior to Duke.  So
24 where did you get your basic K9 training?
25   A.   So I started back in 2006.  So I started going

Page 23

1  out to the -- to the club and training dogs, decoying.
2  It's -- it -- the sport is called Schutzhund.  And I
3  would basically train under these professionals that
4  would show their dogs and compete them.  And I would
5  work them, learning how to catch them, and the ins and
6  outs of working a dog.  So I was -- I was out there for
7  about two years and then I got my first dog.  His name
8  was Yoshi, in 2008.  There, I -- then, I went through
9  the process of training with Tom, again, for 100 hours.
10 And I trained with Doug Eldridge for 100 hours through
11 narcotics.  And we also have a group that we meet every
12 Wednesday, sometimes more, northern Kentucky, different
13 handlers.  We could have ten to 15 guys that we -- we tr
14 -- work with every week.
15   Q.   Do you know if Tom had any law enforcement
16 background?
17   A.   Yes, ma'am.
18   Q.   Okay.  And can you describe that?
19   A.   He was -- see, he -- he was the chief of
20 Walton, which is -- from -- that was way back in the
21 day.  He worked several dogs as a patrolman there.
22   Q.   And how many weeks was your basic K9 school?
23 Did you say it was 100 hours for you as well?
24   A.   Yes, ma'am.  So with Ernie, it was different
25 because he -- I got him at a year old, when he was 12

Page 24

1  months.  So it took him a little bit longer because we
2  didn't want -- I mean, he's fresh.  I mean, it's -- so I
3  would say it -- it probably took us about six months
4  with Ernie.
5    Q.   Okay.  So that I'm clear, your basic K9 school
6  is concurrent with the dogs?  Or are you trained first,
7  which is what I'm asking about, and then you train the
8  dog?
9    A.   No, we both go through it, though --
10   Q.   At the same time?
11   A.   Yes, ma'am.
12   Q.   And I heard you say you still meet every
13 Wednesday, is that for training or just an informal
14 meeting?
15   A.   We do train.  Right now, I'm training two dogs
16 and two new handlers.  I train -- our group trains with
17 Erlanger, Kenton County, Independence, some Boone County
18 dogs, Florence, Newport.  If those guys are available,
19 you know, you said, we usually have about -- we can go
20 from ten to 15 handlers training it.
21   Q.   So during that 100 hours of training, do you
22 still handle calls for service or is your work week
23 completely dedicated to the K9 training?
24   A.   So it's a little different now.  Back then, it
25 was -- I would -- my schedule got altered, so I would -

Page 25

1  - every day, either on my own time or going out to Tom's
2  place, I would train.  Now, it's -- I'm training other
3  dogs as far as on-shift, off-shift, Wednesdays.
4  Depending on where we're at in the county, or Grant
5  County, wherever, if people need dogs for a call, we can
6  send one, but usually, a -- they leave us alone.  We're
7  not tied to the radio, we're just available, I guess
8  that would be it.
9    Q.   Okay.  How many hours a month do you train --
10 do K9 training?
11   A.   Let's see, so my base is probably -- we have
12 to train six hours every Wednesday.  So it's, you know,
13 depending on how many Wednesdays, but it is more than
14 that with the new dogs or with different handlers,
15 trying to help them out, so I can meet before work.  So
16 30 -- let's see, 20, 25, for a Wednesday -- but then
17 plus, I'd say.
18   Q.   Okay.  And you said sometimes you'll train
19 with Erlanger and Kenton County and there was some other
20 agencies that you named.  So, who's in charge of
21 training during that time?
22   A.   Really, we kind of go off each other.  As far
23 as there is a guy that needs help with something, we --
24 we will -- we'll help each other out.  Let's see, the
25 sen -- as far as seniority, as far as the older guys,

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 26

1   it's -- it's me and this other guy, where I kind of help
2   them if they're having issues with things, based on my
3   knowledge and the experiences I've been through and the
4   training I've been able to go to.  I just help them out
5   with that, yeah.
6       Q.    Okay.  So at Covington, who is your K9 unit
7   program coordinator?
8       A.    It'll be Sergeant David Griswold.
9       Q.    And who was your K9 supervisor?  Are they
10  different?
11      A.    No, ma'am.  That -- so he's our supervisor.
12  And of course, Captain Josh Bornhorn would be our -- our
13  patrol commander.
14      Q.    Okay.  Does Sergeant Griswold have a K9
15  background?
16      A.    Yes, ma'am.
17      Q.    And if you know, what is his background?
18      A.    He worked a Schutzhund dog out of the sport,
19  so he's -- he's helped decoy and catch -- train my dogs
20  as well, ol -- when we -- he used to go to the club.  But
21  other than that, not -- no police.
22      Q.    Does he attend the weekly trainings?
23      A.    Yes, ma'am.
24      Q.    What does he -- what is his role in the weekly
25  trainings?

Page 27

1       A.    So he -- he -- of course, he makes sure we're
2   there, so we're on the clock and stuff.  He watches for
3   safety stuff.  He watches -- you know, there's issues
4   that he oversees or sees, the -- he'll give his opinion
5   or suggestions on how to fix stuff or try, you know, to
6   help the dog, or just different views on working a K9
7   from an outside perspective.
8       Q.    Does Covington have an in-house trainer?
9       A.    A K9?
10      Q.    Yes.
11      A.    I would say that the -- since -- I don't know.
12  I've -- I've been training forever and they usually go
13  to me, so I --
14      Q.    Okay.
15      A.    -- I would say not formally, but I -- I do a
16  lot of the training.
17      Q.    Okay.  Is a monthly proficiency report
18  prepared?
19      A.    Yes, ma'am.
20      Q.    Who does that?  You or Griswold?
21      A.    So each handler -- we have four handlers.  We
22  will do a monthly, and then we send it to Sergeant
23  Griswold, who sends it up to captain -- and -- and then up
24  to our assistant chief.
25      Q.    When you're on shift -- well, what shift do

Page 28

1   you work now?
2       A.    I'm working 18:00 to 02:00.
3       Q.    And what shift does Sergeant Griswold work?
4       A.    He works 21:00 to 07, so third shift.  I'm on
5   power.  I'm going back to third, and the -- on the 1st.
6   So --
7       Q.    Yeah.  If you're -- if you know, was Sergeant
8   Griswold working on the date of this incident?
9       A.    Yes, ma'am.
10      Q.    Okay.  Did Sergeant Griswold give prior
11  authorization for the use of Duke?
12          MR. MANDO:  Objection.  Form.  Go ahead.
13          THE WITNESS:  I want to -- I want to say yes.
14      He -- they called me out on the radio, that they
15      called to see if Duke was available.
16  BY MS. WASHINGTON:
17      Q.    Okay.  And do you know -- when you say, they
18  called you, are you talking dispatch or another officer?
19      A.    I'm not sure how the lang -- language went,
20  because I was getting off work, because it was around my
21  end time.  And then the communication to dispatch, see
22  if I was available.  I said yes.  Got my gear back on
23  and went back out.
24      Q.    Okay.  But you never had a conversation with
25  Sergeant Griswold regarding Duke's deployment?

Page 29

1       A.    Prior to -- I don't -- I can't recall.
2       Q.    Okay.  Is supervisor authorization required?
3       A.    No, ma'am.
4       Q.    Okay.
5       A.    I -- I'm sorry.  It's -- if it -- we leave the
6   city, just depends on our -- how busy we are, he'll say
7   yes.  Go ahead.  If we're leaving the city --
8       Q.    Okay.
9       A.    -- as far as -- sorry.
10      Q.    So your understanding -- you're fine.  It's
11  only if you leave the city that you have to have prior
12  authorization from a supervisor?
13      A.    Yes, ma'am.
14      Q.    Okay.  Now, in the policies received from your
15  attorney during discovery, they gave me policy 41.9.9,
16  "K9 Utilization Guidelines."  Are you familiar with
17  that?
18      A.    Yes, ma'am.
19      Q.    Okay.  And A2 says, "Any officer requesting a
20  K9 team assigned to their sector will have the request
21  authorized by a supervisor."  Do you know if that
22  request was made by any of the other officers?
23      A.    No, ma'am.  Again, like, as far as having to
24  request -- or having a supervisor approve of a K9,
25  either -- if we're not available, other agency -- other

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 30

1  K9s from other agencies coming in, other guys will ask
2  for a K9 if one of us isn't working.
3      Q.   Okay.
4      A.   So I -- I don't know if that's the way that
5  reads, or if it's -- if you're asking if I have to ask
6  permission to --
7      Q.   Right.  So it's your understanding that if
8  you're available, you're able to be used, there -- that
9  re -- prior approval is not required?
10     A.   Yes, ma'am.
11     Q.   Okay.  Officer Lusardi, have you ever heard of
12  a proximity alert?
13     A.   Yes, ma'am.
14     Q.   And what is that?
15     A.   Proximity alert, either -- we can take
16  narcotics and I'll -- I'll describe the -- a track.  So
17  as far as narcotics, it will be -- say the narcotics is
18  in the -- the bookshelf and the dog is coming in, he
19  will alert.  He'll sniff the air and he'll work -- it's
20  kind of a scent cone, so like, a traffic cone where the
21  odors bring it out, but it'll actually come to a point
22  where the dog can work his way in.  As far as a track,
23  if there's a subject that is hiding, it could be -- de -
24  - depending on the wind direction, it could be ten
25  yards, it could be 50 yards, it could be 100 yards.

Page 31

1  Depends on how long that guy's been bedded down and the
2  -- the odor is spreading out.
3      Q.   Does Duke have a tell for his proximity alert?
4      A.   He -- he does have a -- he's been trained on
5  it, so he knows if a proximity alert is.
6      Q.   And how does he alert you?
7      A.   He goes in the drive, like, he pulls a lot
8  harder.  Obviously, he doesn't know the distance, but he
9  knows -- he's -- he catches the odor.
10     Q.   So when Duke catches the odor, he pulls hard,
11  giving you the proximity alert, and that tells you what?
12     A.   That we are close.  We're in an area that the
13  subject could be in.
14     Q.   When Duke picks up that scent -- I believe you
15  called it a cone?
16     A.   Scent cone.  Yes, ma'am.
17     Q.   Yeah, the scent cone, and he alerts you to
18  their proximity, does he have a different alert if the
19  person is kneeling down, hiding, versus standing?
20     A.   No, ma'am.
21     Q.   Does he have a different alert if the person
22  is an adult or a child?
23     A.   No, ma'am.
24     Q.   Okay.
25     A.   We don't track children.

Page 32

1      Q.   Okay.  So his alert is just his alert to a
2  person, to a person?
3      A.   Yes, ma'am.
4      Q.   Okay.  Are you familiar with guard and bark
5  versus find and bite?
6      A.   Bark and hold?
7      Q.   Uh-huh.
8      A.   I don't -- I'm -- I do  --
9      Q.   And I know there's different terminologies.
10     A.   Yes, ma'am.
11     Q.   I know some people -- some say bite and hold,
12  bark and hold.
13     A.   Yes, ma'am.
14     Q.   Okay.  That's the terminology you'd like to
15  use?  Okay.  Are you familiar with that?
16     A.   Yes, ma'am.
17     Q.   Okay.  And what does that mean?
18     A.   So a -- a bark and hold is a old -- or a --
19  not old, several years ago that's the way dogs were
20  trained, as far as guarding -- or finding a subject,
21  barking, and then letting the dog decide what to do.  Is
22  -- it has been changed to -- it's also used in the
23  sport, sorry about that.  As far as Schutzhund, it's
24  used in the sport, the bark and hold.  The fine -- find
25  and bite, is that what you're -- was the other one?

Page 33

1      Q.   Yes.
2      A.   So that one is where basically the K9 is in
3  the area, locates the subject, and engages the subject
4  who is hiding, or anything like that, based on, you
5  know, his training and his instinctive drive.
6      Q.   Do you -- did you ever train Duke on bark and
7  hold?
8      A.   No, ma'am.
9      Q.   So does all of Duke's trackings end with a
10  bite?
11     A.   No, ma'am.
12     Q.   On the decoy, does all of his training end
13  with find and bite?
14     A.   No, ma'am.
15     Q.   Okay.  Because I didn't see where he was ever
16  trained on bark and hold.  Did I miss that?
17     A.   No, he's -- he's not trained at all, so if we
18  -- if the dog can't get to the decoy, he'll bark.  So if
19  he's in a tree or we -- we put them in cages -- decoys
20  in cages, or at the end of the track is a ball.  We just
21  put a ball at the end of the track or we throw a ball
22  towards the end of the track.
23     Q.   But if he can get to him, and it is a human
24  subject, then he will find and bite --
25     A.   Yes, ma'am.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 34

1    Q.   -- is that correct?  Okay.  I'm going to start
2  switching a little bit towards the date of incident.  But
3  before we do, Officer Lusardi, do you consider the use
4  of a K9 or the release of a K9 to be deadly force?
5    A.   No, ma'am.
6    Q.   And why is that?
7    A.   They're -- are tools, just like a taser or any
8  other kind of impact weapon or OC.  They are locating
9  tools that -- less lethal, I guess, to -- to able to
10 apprehend somebody safely and to protect the officers.
11   Q.   And when you say "less lethal," less lethal
12 than what?
13   A.   A firearm.
14   Q.   You wear a duty belt while you are on duty?
15   A.   Yes, ma'am.
16   Q.   Can you tell me what's contained in that duty
17 belt?
18   A.   I carry OC.  I carry two pairs of handcuffs, a
19 radio, my firearm, two different magazines for my
20 pistol, let's see -- tourniquet.  That's it.
21   Q.   Okay.  While you're on duty, do you have
22 access to a taser?
23   A.   I'm sorry?
24   Q.   Okay.
25   A.   I have a taser.  I apologize.

Page 35

1    Q.   Don't be sorry.  What about any type of Mace
2  or pepper spray?
3    A.   Yes, ma'am.  I -- I carry that on my belt.
4    Q.   And which one?
5    A.   I carry both.  I -- I apologize.  I -- I do
6  have a taser and I do carry my OC.
7    Q.   You do this every day, so it is probably, you
8  know, second nature for you.  No problem.  What about
9  any type of baton or wand or...
10   A.   So I -- I don't carry a -- baton.  It's in
11 my car.
12   Q.   Okay.
13   A.   It's in --
14   Q.   So you have access to it in the vehicle --
15   A.   Yes.
16   Q.   -- just not on your person?
17   A.   Yes.
18   Q.   Are there any other protective items in the
19 vehicle, besides the baton?
20   A.   As far as less lethals or -- or just --
21   Q.   Just period.
22   A.   Any -- any other gear?
23   Q.   Uh-huh.
24   A.   Let me see, I have prying tools.  I carry an
25 AR-15.  I carry a level three plate carrier.  Let's see.

Page 36

1  I carry a gas mask.  I have dog vests, bulletproof vests
2  for my -- dog.  What's it?  Just different knives, I
3  guess.
4    Q.   And to be clear, these are mixed between your
5  duty belt and the vehicle, but of the taser, the Mace,
6  the pepper spray, the baton -- looks like that's about
7  it.  Out of those -- I'm sorry, and your AR-15 and your
8  firearm, you believe -- or let me ask you: Where do you
9  believe the deployment of a dog falls in the severity of
10 all of those tools listed?  Let me ask that a different
11 way.  You said that a dog is less lethal than your
12 firearm.  Of all of those other items that you just
13 mentioned, are any of those other items more lethal than
14 the release of a dog?
15   A.   One more time.  I apologize.
16   Q.   No, no.  You're fine.
17   A.   Trying to -- I think I'm --
18   Q.   It could probably come out a different way, so
19 let's do that.  Previously, I asked you did you believe
20 the release of your K9 to be deadly forced?  And you
21 said, it's less lethal than your firearm.  And then you
22 gave me a list of a lot of other items that you had,
23 including Mace, a taser, pepper spray, a baton.  And I'm
24 asking, are any of those things, in your opinion, more
25 lethal than the dog or the firearm?

Page 37

1    A.   No, ma'am.  As -- as far as releasing a dog, I
2  can release him based on open-hand strike to punching.
3    Q.   And we talked earlier about the difference
4  between a DVO and an EPO.  In your opinion, is violation
5  of a DVO, without any physical contact or threat, would
6  that be a -- considered a serious crime, in your
7  opinion?
8    A.   Yes, ma'am.
9    Q.   And how so?
10   A.   As far as the -- in violation in Kentucky, it
11 -- it -- fleeing a scene of a DVO is a felony.  And
12 that's why we -- we usually take action.
13   Q.   I'm sorry, you said fleeing the scene?
14   A.   Or leaving the scene --
15   Q.   Right.
16   A.   -- or whatever if we're on scene or something
17 like that.
18   Q.   Okay.  And -- but if the person is still on-
19 scene and they're not posing a physical threat, would
20 you still consider that a serious crime?
21   A.   Yes, ma'am.  They will -- they're going to
22 jail.
23   Q.   Okay.  And if they go to jail and they're
24 charged, do you know if it's a felony or a misdemeanor?
25   A.   If they're in violation, I believe it's a

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 38

1  felony.
2      Q.   Okay.  And when I looked at, it said it's a
3  Class A misdemeanor.  Does that sound right?
4          MR. MANDO:  Answer what you know, Michael.
5          THE WITNESS:  I don't.
6  BY MS. WASHINGTON:
7      Q.   Okay.  And if, in fact, it is a Class A
8  misdemeanor, you would still consider that a serious
9  crime without any physical contact?
10     A.   Yes, ma'am.
11     Q.   Can you -- have you ever released a dog for
12  release -- I'm sorry, for violation of a DVO only,
13  whether it was Duke or Ernie -- or have you ever
14  deployed a dog for the sole violation being violation of
15  a DVO?
16     A.   I -- I don't -- I don't know.
17     Q.   Okay.  But nothing comes to mind?
18     A.   Right.
19     Q.   Do you know how many -- do you know how many
20  officers were on scene when you arrived with Duke?
21     A.   No, ma'am.
22     Q.   At least one, the officer who called you,
23  correct?
24     A.   Correct.
25     Q.   Okay.  Did you see anyone else when you

Page 39

1  arrived?
2      A.   I know Officer Jones was there, Officer Gier,
3  and Officer Matthews.  I know there -- there was
4  cruisers all over the place, up and -- up on top of the
5  flood wall, down below, at Rizzo's.  Let me see.  I
6  believe by 13th Street, seven.
7      Q.   When you began your track, would that be the
8  correct verbiage for the suspect?
9      A.   Yes, ma'am.
10     Q.   Where were the other officers located, if you
11  know?
12     A.   I said they were on top of the flood wall.  We
13  had bike officers on the path.  There was several
14  officers at Rizzo's.  There was several officers down on
15  the other side, the east side of the -- west side of the
16  flood wall, and then towards 13th Street.
17     Q.   What was the purpose of them being placed all
18  these places?  Was that for a perimeter?  Were they
19  looking for witnesses?  What was the purpose?
20     A.   A perimeter.
21     Q.   Did you set up that perimeter?
22     A.   No, ma'am.
23     Q.   But you did confirm that that perimeter was
24  established?
25     A.   I knew it was there.  I -- I didn't establish

Page 40

1  anything.
2      Q.   Do you know if it's your responsibility or the
3  responsibility of someone else on scene to ensure that
4  that perimeter is set up?
5      A.   Usually, there -- whoever's involved, or the
6  contact officers will set up perimeters.  If I need to
7  adjust them, I'll adjust them.  But I -- usually I don't
8  set them up unless I'm right there on scene.
9      Q.   Okay.  But that's not normally something you
10  do?  Something -- someone else that's on scene --
11     A.   Yes.
12     Q.   -- handles that?
13     A.   Yes.
14     Q.   Okay.
15         THE REPORTER:  Can you make sure to keep your
16     voice up, please?
17         THE WITNESS:  Oh, sorry.
18         MS. WASHINGTON:  He's soft and I'm loud.  That
19     doesn't work well, does it?  Kind of -- I'm
20     listening to us, and it reminds me of when my mom is
21     watching her TV up really loud and then a really
22     loud commercial comes on.  So I'll try to be a
23     little bit lower, if you can be a little bit louder
24     for her?
25         THE WITNESS:  Yes, ma'am.

Page 41

1  BY MS. WASHINGTON:
2      Q.   Okay.  And then again, I was looking at -- in
3  that same policy that we just pulled out -- I'm trying
4  not to put all of these in, but D, "Patrol K9 Tracking
5  Capabilities."  It says, "The K9 handler should take
6  charge using arriving units to set up a perimeter for
7  containment and observation."  But you're saying that
8  that's -- as long as that perimeter is set up, it's
9  fine?
10     A.   Yes, ma'am.
11     Q.   Whose decision was it to deploy Duke?
12     A.   Mine.
13     Q.   Are you familiar with the term "K9
14  announcement"?
15     A.   Yes, ma'am.
16     Q.   Okay.  And what is the purpose of a K9
17  announcement?
18     A.   So to either give the subject that we're
19  looking for an opportunity to come out, or others in the
20  area to leave the area.
21     Q.   Were you trained on anything specific about
22  volume, how often to give it?  Were you -- what type of
23  training were you given about K9 announcements?
24     A.   Give an announcement as -- as best you can.
25     Q.   That's the standard?

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 42

1    A.    As comfortable as you are, yeah.
2    Q.    So, per your report, after you left the tent
3  area -- do you know which area I'm talking about --
4    A.    Yes, ma'am.
5    Q.    -- referring to?  Okay.  You stated you
6  understood the reason why Duke was pulling so hard is
7  because he was telling you that someone was in the area?
8    A.    Yes, ma'am.
9    Q.    Okay.  And then per your report, you thought
10 someone was hiding in the thick vegetation?
11   A.    Yes, ma'am.
12   Q.    And we talked about alerts earlier.  So even
13 though you were looking for this Shaun Baker, you didn't
14 know if this was an adult or a child?
15   A.    No, ma'am.
16   Q.    Okay.  And per your report, you didn't know if
17 this person was standing, laying, or crouching, correct?
18   A.    Correct.
19   Q.    Do you know how far it is from the tent area
20 where Mr. Davis was sleeping in his hammock to the tent
21 area that you were at prior?  Do you know how far it
22 was?
23   A.    No, ma'am.
24   Q.    Okay.  Did you give an announcement at the
25 tent area?

Page 43

1    A.    Yes, ma'am.
2    Q.    Okay.  Now on the video, it was about two
3  minutes from the time you gave that announcement until
4  the time you came upon Shaun.  Would you dispute that
5  time frame?
6        MR. MANDO:  Objection, but --
7  BY MS. WASHINGTON:
8    Q.    I'm going to --
9        MR. MANDO:  Oh.
10 BY MS. WASHINGTON:
11   Q.    -- submit to you that it's two minutes by my
12 timing, but do you have any reason to dispute that?
13   A.    No.
14   Q.    Okay.  Before -- so different question: Did
15 Duke find and bite, or did you give him a command to
16 bite?
17   A.    I believe that Duke found him and bit him.
18   Q.    Okay.  What is the bite command?
19   A.    Packen.
20   Q.    And do you have a command for him to release?
21   A.    Yes.
22   Q.    What is that?
23   A.    Oust.
24   Q.    House?
25   A.    Oust.

Page 44

1    Q.    Oust?
2    A.    O-U-S-T.
3    Q.    Okay.  And it's your -- in your memory, Duke
4  found the subject and bit prior to -- or without a bite
5  command?
6    A.    Yes.
7    Q.    Okay.  And if I submit to you that you used
8  the word packen more than once in the video, would you
9  dispute that finding?
10   A.    No, ma'am.
11   Q.    Okay.  And if you use the word packen would
12 Duke understand that to mean "bite"?
13   A.    Yes, ma'am.
14   Q.    Okay.  We're going to talk about from that
15 time to the end, but do you remember ever giving Duke
16 the release command of oust?
17   A.    Yes, ma'am.
18   Q.    Do you know when?
19   A.    At the -- when I was getting him off.  I said,
20 out [sic], and he came off.
21   Q.    Okay.  And per your report, isn't it true that
22 you gave Duke the command of packing [sic] without ever
23 giving a K9 announcement?
24   A.    I gave a K9 announcement.
25   Q.    Okay.  So are you talking about the

Page 45

1  announcement at the tent two minutes earlier, or an
2  announcement in the area that Shaun was in?
3    A.    At -- at the track area, when I was by the
4  tent area, I gave my announcement and we continued.
5    Q.    Okay.  So that we're both clear, you gave your
6  announcement at the tent area.  And then several minutes
7  later, you came upon Shaun.  Did you give an
8  announcement at the point where Duke alerted to the
9  subject?
10   A.    No, ma'am.
11   Q.    And is there a reason why?
12   A.    Because based on this guy's history, I gave my
13 announcement already, my K9 announcements prior.  I only
14 have to -- I give announcements.  There's no -- every --
15 you know, how many do I have to give as far as every ten
16 yards, every 15, 20 yards.  Duke was in the right area.
17 Based on this subject's past history of disarming a fire
18 -- officer and stuff like that, case law -- there is
19 case law that says I do not even have to give
20 announcements releasing the dog on that.  As far as his
21 history, he's -- he knows where we're at.  As giving my
22 location again, I didn't feel a need to give another
23 announcement.
24   Q.    Okay.  And there were multiple tents down
25 there, right?

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 46

1    A.   There's several.
2    Q.   Okay.  So, Duke really could have picked up a
3 cone scent, but it could have been any of those
4 residents, correct?
5    A.   I believe that we were on the right guy.
6    Q.   And what -- why did you believe that?
7    A.   Because -- is -- there -- the announcements,
8 plus there's been several officers in the area that were
9 up there, that people came out or not.  But I believe we
10 were on track from the short distance, or the length of
11 the track to him.  I -- I believe he was hiding from us.
12    Q.   So, when you thought Duke was standing on the
13 suspect, why not just recall him and give the suspect an
14 announcement?  You said the purpose of that is to give
15 the person a chance to surrender or to give other people
16 a chance to leave.  Is it possible, even if you were on
17 the right suspect, that someone else could have been
18 with him?
19         MR. MANDO:  Objection.  Form.  Go ahead.
20         THE WITNESS:  So is -- we're already at a
21    disadvantage, and if he wants to come out, he would
22    have came out.  If he was armed and wanted to shoot
23    us, he had -- ultimately has the -- the most
24    advantaged point.
25 BY MS. WASHINGTON:

Page 47

1    Q.   Okay.  Let's talk about that.  Were you ever
2 told that he had any type of weapon?
3    A.   Nah.  I believe they said he may have been
4 armed.
5    Q.   Who said that?
6    A.   I -- I believe it was the female to Jones.
7    Q.   Okay.
8    A.   Based on his history.
9    Q.   Okay.  Because she didn't say that on the
10 body-worn camera, but you think she told Jones that he
11 might be armed?
12    A.   Possibly, because we -- you know, we go into
13 situations where, you know, most people that are hiding
14 in the woods are armed.
15    Q.   But my question was: Were you told that a
16 weapon had been seen or that there was a weapon involved
17 with the suspect?
18         MR. MANDO:  Objection.  Form.  Go ahead,
19    Michael.
20         THE WITNESS:  I don't -- I can't recall, ma'am.
21 BY MS. WASHINGTON:
22    Q.   Okay.  But as we see here today, you can't
23 recall anyone specific who would have told you about it?
24    A.   No, ma'am.
25    Q.   Okay.  Were you told that -- when Ms. Spray

Page 48

1 came into contact with the suspect, was he violent with
2 her?
3    A.   No, I don't recall.  He --
4    Q.   Were you told that he had threatened her?
5    A.   I don't recall.
6    Q.   So that I'm clear, you're not sure you had
7 been told he had been violent, that he had been
8 threatening, that he was armed, but you had been told
9 that he had a prior history of violence and violence
10 with police officers; is that correct?
11    A.   Yes.
12    Q.   And do you know how many times he had had
13 violence with an officer?
14    A.   Let's see.  At least one, two.  He -- we're
15 very familiar with him.  We have a officer that's 400
16 pounds, big guy, well respected.  And he is the one that
17 disarmed him, so...
18    Q.   And you were aware of that?
19    A.   Yes, ma'am.
20    Q.   And if the officers are very aware of him,
21 would they not know what he looks like?
22    A.   Yeah, I'm sure they'd know.
23    Q.   Okay.  So him having this prior history,
24 that's justification for bringing the dog in, but you
25 believe that's also justification for not giving him a

Page 49

1 warning?
2         MR. MANDO:  Objection.  Form.  Characterization.
3    Go ahead, Michael.
4         THE WITNESS:  The justification was the EPO
5    violation, his past history with dealing with the
6    police, the demeanor of when the officers talked to
7    the female victim.
8 BY MS. WASHINGTON:
9    Q.   Explain that to me?
10    A.   From -- from what they viewed, that's why they
11 called me to come in and find him.  That's -- all those
12 match as far as deploying the dog.
13    Q.   Okay.  And right.  And so I understand that
14 those are the reasons for deploying the dog.  I'm
15 asking: Are those the same reasons that justified not
16 giving a K9 announcement?
17    A.   I --
18         MR. MANDO:  Objection.  Characterization.  Go
19    ahead.
20         THE WITNESS:  I did give a K9 announcement.
21 BY MS. WASHINGTON:
22    Q.   Okay.  And so we can move on.  The K9
23 announcement you're referring to is the one at the tent,
24 more than two minutes prior?
25    A.   Yes, ma'am.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 50

1   Q.   Okay.  And you said that the announcement you
2   gave was pretty much in line with how you were trained.
3   So if you walked in a home and you opened the door and
4   gave announcement at the front door, would that
5   announcement be sufficient for the entire search of the
6   house?
7   A.   So it -- it's a little different from -- we
8   don't search homes --
9   Q.   Uh-huh.
10  A.   -- depending on the situation.  Usually, you -
11  - you know, we would give announcement at the -- the
12  front door and we'll go from there.  Now, if the house
13  is, like, a shotgun-style house, it's -- it -- we're
14  fine with it.  And -- but if it's a huge building like
15  this, I would change -- I would go to different floors.
16  Q.   So why give an announcement at all?  You gave
17  two announcements at both of the tents.  Why give an
18  announcement at all, due to the dangerous nature of
19  Shaun Baker?
20  A.   Absolutely.  I mean, I didn't have to, but I
21  did.
22  Q.   Right.  So if you gave one at the first tent
23  and gave one at the second tent, why not give one when
24  Duke was standing on the suspect?
25  A.   Because I don't -- I didn't feel the need to

Page 51

1   give one.  Duke was already engaged the suspect [sic]
2   when we were in -- nearing the suspect, you know.
3   Q.   Okay.  We're not going to do the video today.
4   We're going to do that at trial, but have you had an
5   opportunity to review the body-worn camera?
6   A.   Yes, ma'am.
7   Q.   And the way you remember it, is that the way
8   it is -- you remember seeing it?  So in other words, the
9   video that you viewed, is that the way that you remember
10  it as you're telling it to me today?
11  A.   Yes, ma'am.
12  Q.   Okay.  And then you said Duke was already on
13  the subject.  Was there time for you to announce your
14  presence prior to entering that area?
15  A.   I -- I did.  I don't --
16  Q.   Okay.  Are you trained in any de-escalation
17  techniques before applying use of force?
18  A.   Talking to people.  Yes, ma'am.
19  Q.   Any other techniques?
20  A.   I apologize, I don't -- I'm not real sure what
21  the --
22  Q.   Okay.
23  A.   -- is...
24  Q.   So what I'm referring to is your policy 1 --
25  I'm sorry, Covington Police Department's Policy 1.31.  It

Page 52

1   says, "Application of de-escalation techniques means the
2   concept or proportionality, crisis recognition,
3   effective communication, and using distance and cover to
4   create time, contact and cover responsibilities,
5   tactical repositioning, and slowing down situations that
6   do not pose an immediate threat."  Are you familiar with
7   that policy, sir?
8   A.   Yes, ma'am.
9   Q.   Had you seen the subject prior to Duke being
10  deployed?
11  A.   No, ma'am.
12  Q.   Had you heard him?
13  A.   No.
14  Q.   And based off the information you gave me
15  earlier, you thought he posed -- did you believe
16  that he posed an immediate threat?
17  A.   I did.
18  Q.   So in this line, would it mean that anyone who
19  has ever had a scuffle with an officer would be someone
20  who poses an immediate threat, even if say, like, a
21  traffic stop?
22       MR. MANDO:  Objection.  Characterization.  Form.
23  Go ahead, Michael.
24       THE WITNESS:  I think a civilized human being
25  wouldn't fight an officer.

Page 53

1   BY MS. WASHINGTON:
2   Q.   Good enough.  But if he had, does that mean,
3   going forward, that you would always pose him as an
4   immediate threat?
5   A.   Yes, ma'am.
6   Q.   Okay.  And so someone -- anyone who's ever
7   been involved in an escalation with the police, they
8   would not be worthy of any type of announcement prior to
9   the release of a canine solely based on their prior
10  history with the police?
11       MR. MANDO:  Objection.  Characterization.  Form.
12  Go ahead.
13       THE WITNESS:  I gave announcement.
14  BY MS. WASHINGTON:
15  Q.   I -- I'm asking.  This is hypothetical.
16  A.   Okay.
17  Q.   I'm applying what I believe you have said to
18  other subjects going forward, that prior history of
19  being in an escalation with an officer would be enough
20  for them to be a threat going forward, no matter what
21  that current --
22  A.   Okay.
23       MR. MANDO:  Same objection.  Characterization
24  and form.  Go ahead.
25       THE WITNESS:  I -- I -- it just depends on the

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS    Doc #: 37    Filed: 02/20/24    Page: 16 of 42 - Page
ID#: 327
The Deposition of MICHAEL LEONARD, taken on December 15, 2023
54..57

Page 54

1    situation.
2         MS. WASHINGTON:  Okay.
3         THE WITNESS:  Just as far as if I know this
4    guy's got a warrant and he's already fought an
5    officer before and I'd stop him, get out with him,
6    and I can tell, you know, his demeanor, how he's
7    going to be, you know, we're allowed to use less
8    lethal.  And so --
9         MS. WASHINGTON:  Okay.
10        THE WITNESS:  -- I'm just, you know, if he's a
11   -- at a direct threat to me, yeah.  I mean, I'll use
12   whatever I have to use.
13   BY MS. WASHINGTON:
14   Q.   Okay.  And so let's back up there.  You said
15   "a warrant."  Is a warrant the same as a DVO?
16   A.   So -- no.
17   Q.   Okay.  So he did not have an active warrant to
18   your knowledge, correct?
19   A.   To my knowledge.
20   Q.   Okay.  So we can take that one off the table.
21   So why the hurry?  Was Kelli in any immediate danger
22   when you arrived on scene?
23   A.   I didn't talk to her.
24   Q.   Okay.  Did you see her?
25   A.   Not that I know of.

Page 55

1    Q.   Okay.  But to your knowledge, wasn't Kelli
2    with one of the officers or not in any immediate danger?
3    A.   Were -- were they, the officers, in immediate
4    danger?
5    Q.   No.  Was Kelli, the victim, supposed victim --
6    was she in any immediate danger?  I'm trying to figure
7    out, you know, the rush to get down there.  Was Kelli in
8    any immediate danger?
9    A.   I didn't talk to her.
10   Q.   Okay.  We talked about de-escalation
11   techniques, and I've been trying to ask you why things
12   weren't done differently.  I'm going to read you 1.31,
13   "Use of Force."  Generally -- I'm sorry, 1.31A.  It
14   says, "It is the policy of the Covington Police
15   Department that officers shall exhaust all other
16   reasonable means of achieving a lawful police objective,
17   highlighted and underlined, including the application
18   of" -- deeshcalesh -- "de-escalation techniques, before
19   resorting to the use of force."
20        And we've already said -- well, let's move on.
21   It says, and so per department policy, "A clearly
22   audible warning announcing a canine will be released if
23   the person does not come forth, underlined and
24   highlighted, shall be made prior to releasing a police
25   canine."  Are you aware of that policy, sir?

Page 56

1    A.   Yes, ma'am.
2    Q.   Okay.  And in your opinion, the announcement
3    given at the tent conforms to the policy that I just
4    read into the record?
5    A.   Yes, ma'am.
6    Q.   Okay.  And what de-escalation techniques did
7    you use prior to resorting to the use of force?
8    A.   Well, I wasn't -- I didn't have the suspects.
9    I didn't -- I mean, I gave announcements.  We searched
10   for them.  We found them.  There was no de-escalation as
11   far as face-to-face, trying to get him to comply.  I
12   mean, I -- I did what I could.
13   Q.   Understood.  So as we sit here today, you
14   believe you used the proper de-escalation techniques?
15   A.   Yes, ma'am.
16   Q.   Okay.  When we talked about the items that
17   were on your duty belt, is -- or in your vehicle, is a
18   flashlight one of them?
19   A.   Yes, ma'am.
20   Q.   Did you have a flashlight on your person?
21   A.   Yes, ma'am.
22   Q.   Okay.  And when you were tracking, who -- was
23   there any officer tracking with you or were you alone?
24   A.   I -- Officer Jones with me.
25   Q.   Okay.  And so Officer Jones has the same

Page 57

1    equipment that you have -- is the equipment you named
2    standard?
3    A.   It's identical.  You have -- you di -- have
4    different options to carry.
5    Q.   But it's safe to say that with you and Officer
6    Jones there, there were, at minimum, two guns, two
7    tasers, a dog?
8    A.   Yes, ma'am.
9    Q.   Okay.
10   A.   Yeah.  Yeah.
11   Q.   All right.  Were you ever trained to use the
12   name of the suspect when giving your canine
13   announcement?  In other words, have you ever said, John
14   Doe, if you don't come out, we're going to release the
15   dog?
16   A.   In certain situation, we do use them.
17   Barricaded, stuff like that.  If a -- if we knew the
18   name.
19   Q.   In this case, you thought you did though,
20   right?
21   A.   Knew the name?  Yes.  I can't remember if I
22   was told the name or what, but based on what Jones was
23   going through or had learned, that's why.
24   Q.   Okay.  And that's what I'm trying to do, is
25   divide these questions between you and Officer Jones.  So

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 58

1 it's -- I'm taking a moment, because some of these are
2 for you, some are for him.  So please, pardon my pause
3 here.
4         Did you think the canine announcement you gave
5 at the tent would carry all the way to where Mr. Davis
6 was eventually found sleeping?
7     A.  Yes, ma'am.
8     Q.  Did you have any type of description of Shaun
9 Baker?
10    A.  I -- I believe they gave me one and it was a
11 male, white, and jeans and a black shirt or something,
12 black clothing.
13    Q.  Do you know where I can find that information?
14 I haven't found that in any other reports.  Do you know
15 where I can find that at?
16    A.  The description given?
17    Q.  Yes.
18    A.  I think it -- it was either in the call notes
19 or -- remember who's in Jones' report.
20    Q.  Okay.  And then I want to show you what we're
21 going to label as Exhibit 1.  I'm going to give a copy
22 to your attorney first and then he's done, I'll have you
23 take a look at it.  And these are just documents
24 provided to us by your defense counsel.  Is it okay,
25 counsel?

Page 59

1       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2         MR. MANDO:  Yes.  Sure, absolutely.
3         MS. WASHINGTON:  Okay.
4 BY MS. WASHINGTON:
5     Q.  If you will turn to what's been marked at --
6 as CV -- I'm sorry, COV 13.  It's the Covington Police
7 Department use of force report.
8     A.  Yes, ma'am.
9     Q.  This was -- it says the reporting officer is
10 Lusardi.  Does that mean you drafted this use of force
11 report?
12    A.  Yes.
13    Q.  Do you know when you drafted it?
14    A.  That evening.  Wrote it?  Yeah.  Yes, ma'am.
15    Q.  Okay. And really quick, we're not going to go
16 through them today, but your other use of force reports,
17 some of them, where it says reason for presence, like,
18 this says "back-up dispatched."  Some of them say self-
19 initiate.  What does that mean?
20    A.  So if I was dispatched -- so this one is they
21 called for me, so I went for self-initiated as I'm
22 either -- started it or I just went to the call without
23 being dispatched or anything.
24    Q.  Okay.  So as we move down to pretty much the
25 lower third of the page, it says "Level of" -- resistant

Page 60

1 [sic] -- "by Suspect."  "Not responding to commands."
2 So that obviously means you believed -- and we're
3 talking about Sean Davis at this point, correct?
4     A.  I'm writing this report on based on the
5 information I was given.
6     Q.  No, no.  I'm sorry.  When you say "Not
7 responding to commands," are you saying Sean Davis
8 didn't respond?  Or you went because Shaun Baker was not
9 responding?  Who would -- who did not respond to
10 commands?
11    A.  The suspect that I was looking for.
12    Q.  Okay.  So it was your understanding that he
13 had been given commands prior to your arrival that he
14 did not respond to?
15    A.  Yes.
16    Q.  Do you know who would have given him those
17 commands?
18    A.  Just, basically, either the announcement or
19 the presence of officers in the area.
20    Q.  And so I'm clear, you believe that the
21 presence of the officers would have notified Shaun
22 Baker?  That would've been a command to Shaun Baker?
23    A.  I don't know if they gave announcements --
24    Q.  Okay.
25    A.  -- in -- in the area, prior to me -- me

Page 61

1 coming.
2     Q.  Okay.  So when you say "Not responding to
3 commands," that's not a command that you gave?  That's a
4 command you were told he --
5     A.  No, that's --
6     Q.  -- wasn't --
7     A.  -- that's based on me giving an announcement.
8     Q.  Okay.  So this is not Shaun Baker responding
9 before you came?  This is Sean Davis not responding to
10 your tent command?
11    A.  This is the -- based on the suspects I'm
12 looking for.  I gave a command or even at the end of the
13 scene or during the scene and stuff like that, if
14 they're respond to me or not, so...
15    Q.  Okay.  So we can move on, because, I'm sorry.
16 I'm still not clear.  So I can mark out the Shaun Baker.
17 We're talking about Sean Davis, who you eventually
18 found?  We're talking about Sean Davis?  It can be a
19 little bit confusing.  Shaun Baker is who you were
20 looking for.  Sean Davis is who you found?
21    A.  Yes, ma'am.
22    Q.  So you initially told me this was for Shaun
23 Baker, but was this for Shaun Baker or for Sean Davis?
24    A.  This was for -- well, I guess it would be
25 Davis or, you know, whoever I was located.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 62

1    Q.    That's okay.  And so that I'm clear, when you
2    said "Not responding" -- because there was a point where
3    you thought Sean Davis was Shaun Baker.  So my question
4    is: Was the not responding to commands prior to the dog
5    bite or after?
6    A.    It -- responding to commands?  Either given my
7    announcement, there was -- nobody responded back to me.
8    (sneezes)
9    Q.    Bless you.  Okay.  And if we turn to the next
10   page, COV 14 is how it's Bates stamped.  Do you see it
11   asks -- so this is a use of force report, and it asks
12   about situational factors and asks you to mark all that
13   apply.  That first box are personal situational factors.
14   Do you see that?
15   A.    Yes, ma'am.
16   Q.    And there are 22 boxes, and out of those 22,
17   you've checked three of them; is that correct?
18   A.    Yes, ma'am.
19   Q.    And that's "Hands hidden," "Ignoring the
20   Officer," and "History of Violence."  I believe we've
21   already discussed history of violence, and that was
22   Shaun Baker, right?
23   A.    Yes, ma'am.
24   Q.    So these other two, then, would they -- who
25   would they be referring to, hands hidden and ignoring

Page 63

1    the officer?
2    A.    So the hands hidden, when we were on -- when
3    he was in the tent or what was --
4    Q.    Hammock?
5    A.    Ha -- hammock.
6    Q.    Yes, sir.
7    A.    When he was there, I couldn't see his hands.
8    That's why when I asked him, you know, show me his
9    hands, get on your belly.  Ignoring the officer is the
10   same as -- as far as show me your hands and stuff like
11   that.  So he --
12   Q.    Okay.
13   A.    -- didn't immediately show me his hands or
14   whatever.
15   Q.    Okay.  So let -- let's back up there a little
16   bit.  So there's not a block here, so I don't fault you
17   for it, but hands hidden really was just hands not
18   visible.  Would that be a fair statement?
19   A.    Yes, ma'am.
20   Q.    Okay.  And then in the environmental section,
21   there's 22 more boxes and eight are checked here.  So
22   "Unstable ground," "Night hours," "Steep or dangerous
23   terrain," "Evading arrests by stealth," "Evading arrests
24   by hiding," "Commercial area" and rural area and "Water
25   environment."  I'm -- it's a co -- so this was a

Page 64

1    combined commercial-rural area?
2    A.    So the Licking River, it transports barges and
3    stuff like that.
4    Q.    Okay.  So three out of 22 personal factors,
5    but eight out of 22 environmental factors.  Would that
6    be correct?
7    A.    As far as the personal, I mean, some of these
8    -- if you read through them, that it didn't match or
9    describe the scene at the time.
10   Q.    Right.  That -- I agree.  I agree.  So when we
11   talked about report writing earlier, I'm just looking at
12   -- maybe at some of the choice of verbiage here.  In the
13   second paragraph of the narrative, do you see where it
14   starts with "The complainant"?
15   A.    Yes, ma'am.
16   Q.    It says, "The complainant stated the subject
17   had a flashlight and was shining it towards her."  But
18   this next line says, "The complainant and her friend
19   exchanged words with the subject."
20        Could just be choice of words, but is
21   "exchanged words" a term or a verbiage usually given
22   when people are exchanging combative words?  Isn't that
23   more of a -- we exchanged words.  Isn't that more of a
24   combative statement versus just they had a conversation
25   and asked him about a light?

Page 65

1    A.    I understand your point.  You know, I don't
2    know.  I wasn't there.
3    Q.    Okay.  And so that's my point.  You said you
4    didn't speak with her, right?
5    A.    Right.
6    Q.    With Kelli?  So "The complainant and her
7    friend exchange words with the subject and the
8    complainant positively identified the subject's voice as
9    her" -- boyfriend.  That was not something you knew?
10   That was something someone had told you?
11   A.    Yes.
12   Q.    Okay.  And really quick, in part of your
13   training as an officer and all the trainings that we
14   talked about, have you ever had a course on eyewitness
15   testimony?
16   A.    As far as?
17   Q.    It's reliability.
18   A.    Witnesses?
19   A.    Uh-huh.
20   Q.    No.
21   Q.    Really?  And so if you've never had one on
22   eyewitnesses, would that mean you've never had one on
23   ear witnesses?  Or what's considered -- well, just let
24   me ask -- let you answer that question.
25   A.    I don't know what that is.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS    Doc #: 37    Filed: 02/20/24    Page: 19 of 42 - Page
ID#: 330
The Deposition of MICHAEL LUSARDI, taken on December 14, 2023    66..69

Page 66

1     Q.   An ear witness is someone who's -- who hears -
2  - who gives testimony based on what they heard versus on
3  what they saw.
4     A.   Okay.
5     Q.   No training on that either?
6     A.   No.
7     Q.   Okay.  So you would have no opinion on whether
8  ear witness or eyewitness is more reliable?
9     A.   No, ma'am.
10    Q.   Okay.  And then if you'll look in that next
11 line, at the end, where it says, "complainant confirmed
12 a second time."  Do you see where I'm at, sir?  I'm
13 sorry.  Officer Lusardi, it's probably about four lines
14 down from the "EPO/DVO" beginning sentence.  Do you see
15 that?  Yes.
16    A.   Okay.
17    Q.   Right about there.  It says, "confirmed a
18 second time that it was her ex-boyfriend, saying" -- and
19 then it has a quotation mark.  "'Yeah, it's his voice, I
20 know my baby dad,'" and then it has an ellipses, dot dot
21 dot, "I was with him for eight years."  Do you see that
22 line that I just read?
23    A.   Oh, there you go.  Yeah, it's -- yes, ma'am.
24    Q.   Okay.  Can you look -- just look at that or
25 read that yourself for me?

Page 67

1     A.   Yes, ma'am.
2     Q.   Okay.  And then, if you will turn for me to
3  what's marked as COV 11.  It's what I call the KYIBRS
4  report.  I don't know its official name.
5          MR. MANDO:  KYIBRS.
6          THE WITNESS:  I --
7          MS. WASHINGTON:  Is it KYIBRS?  Thank you.  I
8  don't want to say that somewhere else and be
9  embarrassed.  Thank you so much.
10 BY MS. WASHINGTON:
11    Q.   Did you write this report, sir?
12    A.   Yes -- or this one?
13    Q.   Yes.
14    A.   This invest -- the investigation?
15    Q.   Yes.
16    A.   Let's see.  Not the NYBIRS [sic].  No, ma'am.
17    Q.   Okay.  So it's my understanding that this was
18 written by Officer Jones.  Would that be your
19 understanding?  Or at least you know it wasn't you?
20    A.   Yeah, three.  That's his badge number.
21    Q.   Okay.  And if you would look for me in what
22 would be the fourth paragraph, where it starts with, "I
23 asked Spray."  Do you see where I'm at?
24    A.   Yes, ma'am.
25    Q.   It says, "I asked Spray if she knew Baker was"

Page 68

1  -- should be in the woods, and she replied -- and it's
2  this part here that I'm most concerned about.  Says,
3  "'Yeah, it's his voice, I know my baby dad," with an
4  ellipsis, dot dot dot -- "I was with him for 8 years."
5          That is the exact quotation with the exact
6  grammatical commas and quotation marks as in your
7  report.  Can you explain how that happened, sir?
8     A.   As far as putting in the facts and stuff into
9  my report to kind of outline what was happening, that's
10 what -- that's what has been put into my report.
11    Q.   Okay.  And so this portion was taken from
12 another report?
13    A.   Yes.
14    Q.   Okay.  So is there any way when someone's
15 reading this report to know what it is you heard or knew
16 firsthand versus what you obtained from another report?
17    A.   So some of the facts and stuff that I've
18 received, kind of putting the background and my use of
19 force, is added.  And then what I did is added in to --
20 right?  It was, like, "With this in mind," saying all
21 this stuff has been brought to people's attention and
22 then brought to my attention.  And so "With this in" --
23 mi -- "in mind, I deployed" -- PS [sic] -- "Duke on a 15
24 foot leash" -- and deployed.
25    Q.   Okay.  And then -- but my question is: Is

Page 69

1  there any way for anyone to know when any of this
2  information is either your firsthand knowledge or
3  whether it's information received from someone else or
4  someone else's report?
5     A.   Yeah, I'm -- or as far as -- I guess I'm not
6  understanding, because I -- basically on my reports, I
7  put out, you know, the background, give the -- how we're
8  -- end up there.  And then, from my point of views, with
9  this in mind, all the -- everything that was given to
10 me, I deployed PS Duke.  That is --
11    Q.   Okay.
12    A.   -- from me.
13    Q.   Right.  So, when we talked about report
14 writing earlier, I asked you were there -- when you
15 wrote your report, was that your firsthand knowledge or
16 was that information that was told to you, or did -- was
17 it information from someone else's report?  And at that
18 time, you advised me that you don't use other reports or
19 other people's information.  You use your firsthand
20 knowledge or your memory, I believe is what you said.
21 And if I'm misquoting you, I can have this beautiful
22 young lady reread it.
23          So what I'm asking now is -- I'm not saying
24 that this is improper.  What I'm asking, based upon that
25 statement, if I were to read this, is there any way for

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS    Doc #: 37   Filed: 02/20/24    Page: 20 of 42 - Page
ID#: 331
The Deposition of MICHAEL LEONARD, taken on December 11, 2023
70..73

Page 70

1  me to know how much of this report is information that
2  you had firsthand, or is it information that came from
3  some other source?  Is there any way for someone reading
4  this to know that?
5       A.   Yes, ma'am.
6       Q.   Okay.  How is that, sir?
7       A.   So I -- I -- gathering information, I think it
8  -- during your investigation or even completing an
9  investigation, I'm allowed to use other people's --
10  like, how'd you get there?  Because I wasn't there on --
11  first on the scene, is get their information and then
12  adding it into my use of force, which when people read
13  it, hey, this is what was given to him.  This is why he
14  did what he did.  And from first base knowledge, it
15  starts with this in mind, I deployed PSC Duke.  Then we
16  go from there.
17       Q.   Okay.  So you're believing that the reader of
18  this report, when you say the complainant and her friend
19  exchanged words with the subject, there's no, I was told
20  Officer X said, so you don't believe that that's
21  confusing to the reader of this report, that this wasn't
22  your firsthand knowledge information?
23       A.   I -- no, ma'am.  I don't think -- I don't
24  think it's confusing.
25       Q.   Okay.  So what if who you got this information

Page 71

1  from was wrong?  Is that possible?  Do officers ever
2  make mistakes?
3       A.   Yes, ma'am.
4       Q.   Okay.  So at best, this office -- this
5  information was told to another party who then told the
6  information to you, at best, if there wasn't other
7  officers in-between, correct?
8            MR. MANDO:  Objection.  Form.  Go ahead.
9            THE WITNESS:  As far as Officer Jones reporting
10       this to me, is what he gave me.
11  BY MS. WASHINGTON:
12       Q.   Okay.  And so that we can move on, sir,
13  nowhere does it say the complainant told Officer Jones,
14  or Officer Jones said.  There's no way for me to know
15  how much of this is yours and how much is Officer Jones;
16  is that correct?
17       A.   I disagree.  I think --
18       Q.   Okay.  Then, on the next page, sir, COV
19  15, it says on the top line, PS -- "Duke went off the
20  path, through high vegetation, pulling as though someone
21  was hiding in the immediate area."  As we've discussed
22  before, Duke's pulling would not let you know if the
23  person was standing or kneeling; is that correct?
24       A.   Correct.
25       Q.   Okay.  So Duke pulled and it was your opinion

Page 72

1  that someone was hiding.  Would that be a fair
2  assessment?
3       A.   Yes.
4       Q.   Okay.  And then on the second paragraph that
5  starts "In fear," -- "In fear for mine and Officer
6  Jones' safety" -- were -- did either you or Officer
7  Jones have your guns?
8       A.   Actually -- I'm sorry.
9       Q.   I'm sorry.  Go ahead.
10       A.   I didn't mean to cut you off.
11       Q.   Go ahead, sir.
12       A.   Can I -- can you finish?  Sorry.  Please.
13       Q.   Yes.  I was asking, did you or Officer Jones
14  have your guns out?
15       A.   Officer Jones.
16       Q.   Okay.  Okay, so at this point, Duke has not
17  yet bitten, right?  He -- you say he's standing on the
18  suspect.  So you have Duke in front, you have an officer
19  in back of you with his gun drawn; is that correct?  Am
20  I characterizing this correctly?
21       A.   No, ma'am.
22       Q.   Okay.
23       A.   Do want me to explain --
24       Q.   Please.
25       A.   -- the cu -- so Duke, when it's saying he's

Page 73

1  standing on him, I think Duke is standing on him and en
2  -- engaged him.  So Officer Jones is to my left -- or
3  either to my left or my right.  He's not -- shouldn't be
4  behind me, either.  If he's behind me, he's one or two
5  feet from me.
6       Q.   Okay.  So then --thank you for that.  So you
7  have Duke in front of you and an officer with a gun
8  drawn to your right or left?
9       A.   Yes, ma'am.
10       Q.   And a gun on your person?  And you feared for
11  yours and Officer Jones' safety because of what reason?
12       A.   Because this guy is a -- has a violent
13  history.  He knew we were in the area.  If he was armed,
14  he could have definitely have taken a shot before he's -
15  - we saw him.
16       Q.   Okay.  So the assumptions at this point --
17  well, the first one, would it be that this was the
18  person you were looking for?  Would that be the first
19  assumption?
20       A.   Yes, ma'am.
21       Q.   Okay.  Would the second be that he was armed?
22       A.   Yes, ma'am.
23       Q.   Would the third be that he knew you were
24  there?
25       A.   Yes, ma'am.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 74

1    Q.   Okay.  And in -- to counter all of these
2  assumptions, the only fact that you had -- or what was
3  the only fact that you had about his dangerousness?
4    A.   Prior history.
5    Q.   Okay.  Okay.  And so I don't know if this
6  helps bring back your memory, I -- because a little bit
7  earlier, I asked you if you gave the announcement for
8  Duke or if he engaged on his own, and you said Duke
9  engaged once he found him.  If you look at the line, it
10  says -- after the one we just read, in fear of yours and
11  Officer Jones safety, "I commanded" -- PS -- "Duke to
12  engage."  Does that refresh your memory at all?
13    A.   Yes.  I'm -- I told him to engage, yes.
14    Q.   Okay.  And that was the packing that --
15    A.   Yes.
16    Q.   -- we were talking about earlier?
17    A.   Yes, ma'am.
18    Q.   And then it says, "I gave commands for the
19  suspect to show his hands even though I couldn't see
20  exactly where" -- PS -- "Duke had engaged the subject."
21  So di -- does that mean you don't know if the suspect
22  was in a position to show his hands?
23    A.   I'm sorry, I'm trying to catch up with you.
24  Where -- what line is it?
25    Q.   Yeah.  I'm trying to go line by line --

Page 75

1    A.   Oh.
2    Q.   -- but you know what?  I may be all over the
3  place.  I'm on the -- so the line we just read, "In
4  fear," -- this --
5    A.   Oh.
6    Q.   -- the first line of the second paragraph.
7    A.   Yes, ma'am.
8    Q.   Yes.  Yes, sir.  At the end of that line, it
9  starts, "I gave commands for the suspect to show his
10  hands" --
11    A.   Okay.
12    Q.   -- "even though I couldn't see exactly where"
13  -- PS -- "Duke had engaged the subject."
14    A.   Okay.
15    Q.   So be -- what was the purpose of you saying
16  "even though" you couldn't see where he was being
17  engaged?
18    A.   All right.  So when I'm -- I'm asking, I gave
19  commands for the suspect to show his hands.  I couldn't
20  see exactly where PSD Duke had engaged the subject, so I
21  didn't know where he -- I knew he had engaged him.  I
22  gave him a command to -- to bite.  He -- as -- he was
23  already on, I'm trying to see his hands, even though I
24  don't know where the suspect is -- is being apprehended
25  at.

Page 76

1    Q.   Okay.  So because you couldn't see where Duke
2  was engaging him, is it possible that the suspect would
3  not be able to show his hands because that's, in fact,
4  where Duke is engaging him?
5    A.   Yeah.  I mean, he could have showed one or two
6  or, you know, announced himself, you know, so...
7    Q.   Okay.  So that I'm clear, the announcement
8  that should have been given should have came from the
9  suspect?
10    A.   And that -- like, if he called out, hey, here,
11  I am, or whatever, you know, something like that now.
12    Q.   And you believe he had that opportunity
13  between the time you arrived and the engagement?
14    A.   Yes.
15    Q.   Okay.  It says, "Due to the height" -- of the
16  "vegetation."  Was the vegetation higher than Duke, if
17  you can remember back to the video?
18    A.   Yes.
19    Q.   So you believe the vegetation was taller than
20  Duke and the hammock would've been where?  Kind of
21  hanging more, like, in the tops of the trees?
22    A.   Nos -- I mean, it was -- I -- Duke's not too
23  big, but I mean, it -- it was -- there's part of the
24  vegetation that was pretty tall and thick.
25    Q.   Okay.

Page 77

1    A.   I don't know how far up the hammock was.
2    Q.   And believing that this very dangerous suspect
3  could be hiding in this high vegetation, were you
4  walking with a flashlight, showing your location?
5    A.   Yes, ma'am.
6    Q.   And you were walking through tall vegetation?
7    A.   Yes, ma'am.
8    Q.   And when I read the rest -- and I'm going to
9  let you look through it, I never seen where you say that
10  you gave the release command, and I didn't see it in the
11  video.  Do you see in the report anywhere where you
12  state that you gave the release command?
13    A.   So at the last paragraph, "I was" -- "I was
14  finally" -- "finally able to free myself and grab PSD" -
15  - by his collar.  "I commanded PSD" -- "to release his
16  grip."
17    Q.   Okay.  And so after you grabbed him by his
18  collar, you commanded him to release his grip.  And you
19  say this is because you were tangled on the hammock
20  cords; is that correct?
21    A.   Yes, ma'am.
22    Q.   Okay.  And being tangled on the hammock cords,
23  which -- that would have to put you right on top of
24  Shaun, right, because he was sleep in the hammock,
25  right?

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Page 78

1          MR. MANDO:  Objection.  Form.
2          MS. WASHINGTON:  And --
3          MR. MANDO:  Go ahead.
4          MS. WASHINGTON:  -- you -- did you say yes,
5    sir?
6          THE WITNESS:  No, he was ac -- he was actually
7    on the ground when I got there.
8    BY MS. WASHINGTON:
9      Q.   At this point?
10     A.   Yes.
11     Q.   But he was in the hammock when Duke found him;
12   is that correct?
13     A.   Yes, ma'am.
14     Q.   Okay.  And so you got caught up in the cords
15   that were the hammock that he was sleeping in, correct?
16     A.   Yes.
17     Q.   Okay.  And that was the reason why you gave --
18   you were breaking free of the cords and so Duke bit him
19   again; is that correct?
20     A.   Yes, ma'am.
21     Q.   Okay.  Could you not have used the release
22   command while you were freeing yourself from the hammock
23   cords?
24     A.   So when he had ahold of him, he had pulled a
25   piece of the -- the cloth off or whatever he had on, and

Page 79

1    then he ree -- went to reengage.  So as I was untangling
2    from my holster, I reached down, and he reengaged, and I
3    grabbed him.
4      Q.   Okay.  And you said you have had a chance to
5    see the video, that's correct?
6      A.   Yes, ma'am.
7      Q.   Okay.  When you watched it, did you hear the
8    tearing?  It wasn't a quick rip, but it's an actual
9    tearing you can hear.  Were you able to hear each of the
10   threads breaking off the coat, like, this took a little
11   bit of time?  Were you able to hear that when you
12   watched the video?
13         MR. MANDO:  Objection.  Characterization.  Form.
14   Answer what you observed.
15         THE WITNESS:  I observed Duke had a hold of --
16   it's -- I don't know if it was a jacket, sleeve,
17   coat
18   --
19         MS. WASHINGTON:  Uh-huh.
20         THE WITNESS:  -- top, whatever, had pulled it
21   off.
22   BY MS. WASHINGTON:
23     Q.   Okay.  And it's your testimony that, in that
24   period of time, there was no opportunity for you to give
25   a release command?

Page 80

1      A.   At that time, where he wasn't under control --
2      Q.   Who wasn't under control?
3      A.   The -- the suspect.
4      Q.   What was he doing?
5      A.   Well, we -- he wasn't handcuffed or anything
6    like that.  So he was laying there.  Jones was trying to
7    get him under his arm.  His arm was still out. Jones was
8    trying to get him under control.  The dog had pulled his
9    -- the sleeve off and then reengaged.
10     Q.   Okay.
11     A.   And as far as giving a command to release, I
12   didn't have control of the dog at that time.  So when I
13   go up, I grab the dog, I had him out, and he releases.
14     Q.   If you had told Duke to release while you were
15   untangling yourself, if you had used the release
16   command, would Duke have, at least in training, would
17   Duke have responded?
18     A.   Yes.
19     Q.   So you said his arm was still out.  Tell me --
20   Shaun has two arms, tell me what was happening with both
21   arms at the time he was not under control.
22     A.   I know the one that Duke had was -- was out,
23   like, straight out.
24     Q.   Okay.
25     A.   I don't know what the other one was.

Page 81

1      Q.   And you just testified a second ago that Jones
2    was trying to get the other one --
3      A.   (Inaudible).
4      Q.   -- behind his back, right?
5      A.   He was -- he he -- I didn't testify to that.  I
6    said he was trying to control the suspect.
7      Q.   Okay.  How was --
8      A.   I don't know what he was --
9      Q.   -- he trying to do that?
10     A.   I don't know.  You know what I'm saying?  He
11   was trying to control him, so I don't know if he -- what
12   he was doing.
13     Q.   But let -- let's understand the picture here.
14   Shaun is on the ground.  Is he on his stomach or his
15   back?
16     A.   His stomach.
17     Q.   Shaun is on the ground on his stomach.  We
18   know that it -- Duke has his left arm.  What do you
19   believe Shaun's doing with his right arm, if you know?
20     A.   I don't know.
21     Q.   What was Jones doing?
22     A.   Again, I don't know.  I was trying to -- to
23   break free of the hammock --
24     Q.   Okay.
25     A.   -- and get to the dog.

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS    Doc #: 37    Filed: 02/20/24    Page: 23 of 42 - Page
ID#: 334
The Deposition of MICHAEL LUSARDI, taken on December 1, 2023          82..85

Page 82

1     Q.   So that we understand what's going on, Shaun's
2  on the ground on his stomach.  Duke has his left arm.
3  You're caught up in a hammock cord and we don't know
4  what Jones is doing?
5     A.   I -- I can't -- I'm not going to testify to
6  Jones' stuff.
7     Q.   Right.
8     A.   I --
9     Q.   So -- because you don't know, is that --
10    A.   That's what I'm saying.
11    Q.   -- your re -- test -- right.
12    A.   Yes, ma'am.
13    Q.   Okay.  After Duke bit Mr. Davis, did you have
14 any conversation with Mr. Davis at all?
15    A.   No, ma'am.
16    Q.   Did you speak with Mr. Davis any more that
17 evening?
18    A.   No.
19    Q.   Did you ever learn that Mr. Davis was not Mr.
20 Baker?
21    A.   Yes, ma'am.
22    Q.   When did you learn that?
23    A.   I don't know the exact time, but after
24 everything was do -- everything was all done.
25    Q.   Was it after you got back to the station,

Page 83

1  while you were still at the bottom of the hill, at the
2  top of the hill, after you had left?
3     A.   I don't remember.
4     Q.   Okay.  Because you wrote the report the same
5  night, right?
6     A.   Yes, ma'am.
7     Q.   And you were getting off work when they called
8  you?
9     A.   Yes, ma'am.
10    Q.   So do you know how much after the incident
11 that you wrote the report?
12    A.   Within an hour or so.
13    Q.   Okay.  And in the report, you already knew
14 that he was Shaun Baker and vers -- I'm sorry, that he
15 was Sean Davis, and not Shaun Baker?
16    A.   Yes, ma'am.
17    Q.   So when did you find that information out?
18    A.   Again, I don't -- I don't know when.  I -- I'd
19 learned it -- and to complete my report.
20    Q.   Okay.
21    A.   I don't know where it was or what time it --
22    Q.   Let's go a different route.  How did you find
23 out?
24    A.   I think one of the officers told me.
25    Q.   Okay.  And -- but you don't remember if that

Page 84

1  was on scene or back at the precinct?
2     A.   Correct.
3     Q.   But were you one of the officers who knew what
4  Mr. Baker looked like?
5     A.   Do I know what he looks like?  No, ma'am.
6     Q.   Okay.  So when you said they all know what he
7  looks like, you were talking about the other officers
8  that were on scene?
9     A.   There are officers that are familiar with him.
10    Q.   Okay.  While you were on scene, did you ever
11 witness Mr. Davis resisting?
12    A.   No, ma'am.
13    Q.   After Duke pulled Mr. Davis on the ground --
14 or let me back up.  Is it your understanding that Mr.
15 Davis was in the hammock and then once he engaged with
16 Duke, he ended up on the ground, however that occurred?
17    A.   Okay.
18    Q.   No, is --
19    A.   Is that what you're saying?
20    Q.   -- is that your testimony?
21    A.   Yeah, that he did.
22    Q.   Okay.  From the time Mr. Davis was located --
23 we've already discussed the canine announcement, was
24 there ever an announcement, Covington Police Department?
25    A.   I said -- I'm going to just answer it no.

Page 85

1     Q.   Okay.  Okay.  Did Mr. Davis ever try to hit at
2  you or kick at you?
3     A.   No, ma'am.
4     Q.   Did he ever try to get up and run away?
5     A.   No, ma'am.
6          MS. WASHINGTON:  Okay.  I think I'm about done.
7  If we can go off record, I'm going to speak with co-
8  counsel here for a second, but I think we might be
9  almost done.
10         (OFF THE RECORD)
11         THE REPORTER:  Okay.  We're back on the record.
12 BY MS. WASHINGTON:
13    Q.   Okay.  Officer Lusardi, what is your
14 understanding of why you and Duke are called in?  So on
15 -- like, some of these, you say you self-initiate, but
16 some, the officers on scene reach out for you.  What is
17 your understanding of why you and Duke are called in?
18    A.   Come in to help them locate, assist them, and
19 anything needed -- they need assists with.
20    Q.   Are -- do you believe that your role is more
21 an investigative role versus a search role?
22    A.   No.  I have many roles as a canine handler,
23 but there are times -- like in narcotics scenarios,
24 there are times -- barricaded subjects, tracking, and
25 stuff like that and locating, or if they need me to do

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

The Deposition of MICHAEL LUSARDI, taken on December 27, 2023                    86..88

---

Page 86

1  felony stops and stuff like that.  I mean, we're
2  involved in a lot of stuff.
3       Q.   Would you characterize you being called when
4  the situation is kind of on high alert?  In other words,
5  are you called because -- I don't know, for minor
6  misdemeanors, you and Duke?
7       A.   We get called for everything --
8       Q.   Okay.
9       A.   -- that I know about.
10      Q.   Can you think of any times you were called for
11  minor misdemeanors and what role you played?
12      A.   All the time.  Narcotics situations,
13  misdemeanors, any -- any type of arrestable offense.  I
14  mean, we get -- we get used for --
15      Q.   Any type of --
16      A.   -- arrestable offense, we get used, so...
17      Q.   Okay.  So give me some examples of times you
18  and Duke were called out when it wasn't narcotics, when
19  it wasn't a fleeing or evading suspect.  Tell me what
20  other type of calls you get.
21      A.   Warrant service.  We'll go help them with
22  serving warrants.  Traffic stops.
23      Q.   And what's the purpose of you being there for
24  the traffic stop?
25      A.   Depending on, you know, is -- if -- people in

---

Page 87

1  the car, history of people that the officers are dealing
2  with, the area or the amount of people around the area,
3  stuff like that.
4       Q.   But --
5       A.   There is --
6       Q.   -- again, these are higher intensity calls,
7  right?  You're not called out on someone -- on a car
8  accident?
9       A.   I do those, too.
10      Q.   And I -- and not just you, I mean, I'm talking
11  about you and Duke.
12      A.   Oh.  Well, I mean, as far as, like deploying
13  him on a car accident?  No, ma'am.
14      Q.   Okay, because there'd be no need for it,
15  right?  And so when Duke is called, it's because there
16  is some type of serious nature -- would you agree
17  there's some type of serious nature to the situation?
18      A.   It -- yeah.  I mean, we are used to find
19  articles, thrown guns, thrown -- stuff like that.  I
20  mean, the -- our role is very broad.
21           MS. WASHINGTON:  Okay.  And I don't think we
22       have any further questions.  Thank you so much,
23       Officer Lusardi.
24           THE WITNESS:  Thank you.  Thank you.
25           (DEPOSITION CONCLUDED AT 12:16 P.M. ET)

---

Page 88

1                    CERTIFICATE OF REPORTER
2
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded digitally by me and then reduced to
10 typewritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skills and ability. I certify that I am not a
13 relative or employee of either counsel, and that I am in
14 no way interested financially, directly or indirectly,
15 in this action.
16
17
18
19
20                    *Olivia Marshall Dosker*
21
22 OLIVIA M. DOSKER,
23 COURT REPORTER/NOTARY
24 COMMISSION EXPIRES ON: 08/18/2027
25 SUBMITTED ON: 12/27/2023

---

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS   Doc #: 37   Filed: 02/20/24   Page: 25 of 42 - Page
ID#: 336
The Deposition of MICHAEL LUSARDI, taken on December 11, 2023
89

**Exhibits**

**Exhibit 1_**
**Lusardi** 58:21
  59:1

**-**

**--thank** 73:6

**0**

**02:00** 28:2
**07** 28:4

**1**

**1** 18:6 51:24
  58:21 59:1
**1.31** 51:25
  55:12
**1.31A** 55:13
**100** 18:18,22
  22:7,14 23:9,
  10,23 24:21
  30:25
**11** 67:3
**12** 23:25
**12-10** 16:24
**12:16** 87:25
**13** 59:6
**13th** 39:6,16
**14** 10:6 62:10
**15** 23:13 24:20
  45:16 68:23
  71:19
**17** 13:16
**18** 14:4 16:24
**18:00** 28:2
**19** 9:1 13:17,18
  19:1
**1st** 28:5

**2**

**20** 14:4 16:21
  25:16 45:16
**2004** 14:3
**2006** 22:25
**2008** 23:8
**2020** 16:21
**2022** 8:12,16
**21:00** 28:4
**22** 62:16 63:21
  64:4,5
**23** 14:2
**23rd** 21:16,23
**25** 25:16
**29th** 17:16

**3**

**30** 25:16

**4**

**40** 14:16
**400** 48:15
**41.9.9** 29:15
**45** 19:11

**5**

**50** 30:25

**6**

**60** 20:3

**8**

**8** 68:4

**9**

**9th** 8:12,16

**A**

**A2** 29:19
**absolutely**
  7:20 22:5 50:20
  59:2
**ac** 78:6
**academy** 14:3
  15:14,15
**access** 34:22
  35:14
**accident** 87:8,
  13
**accurate** 15:24
**achieving**
  55:16
**acting** 10:25
  11:9
**action** 37:12
**active** 54:17
**activity** 13:7
**actual** 79:8
**added** 68:19
**adding** 70:12
**adjust** 40:7
**adult** 31:22
  42:14
**advantaged**
  46:24
**advised** 69:18
**affirm** 6:5
**age** 19:11
**agencies**
  25:20 30:1
**agency** 29:25
**agree** 13:9
  64:10 87:16
**ahead** 28:12
  29:7 46:19
  47:18 49:3,19
  52:23 53:12,24
  71:8 72:9,11

78:3
**ahold** 78:24
**air** 30:19
**alert** 30:12,15,
  19 31:3,5,6,11,
  18,21 32:1 86:4
**alerted** 45:8
**alerts** 31:17
  42:12
**allowed** 54:7
  70:9
**altered** 24:25
**American**
  18:15,25 22:10
**amount** 15:21
  87:2
**Anita** 6:14
**announce**
  51:13
**announced**
  76:6
**announcemen**
**t** 41:14,17,24
  42:24 43:3
  44:23,24 45:1,
  2,4,6,8,13,23
  46:14 49:16,20,
  23 50:1,4,5,11,
  16,18 53:8,13
  56:2 57:13 58:4
  60:18 61:7 62:7
  74:7 76:7
  84:23,24
**announcemen**
**ts** 41:23 45:13,
  14,20 46:7
  50:17 56:9
  60:23
**announcing**
  55:22
**answers** 6:18
**apologize**
  34:25 35:5
  36:15 51:20
**application**
  52:1 55:17

**apply** 62:13
**applying** 51:17
  53:17
**apprehend**
  34:10
**apprehended**
  75:24
**approach** 11:7
**approaching**
  10:16,19,22
  11:3
**approval** 30:9
**approve** 29:24
**AR-15** 35:25
  36:7
**area** 18:20 20:3
  31:12 33:3
  41:20 42:3,7,
  19,21,25 45:2,
  3,4,6,16 46:8
  51:14 60:19,25
  63:24 64:1
  71:21 73:13
  87:2
**arm** 80:7,19
  81:18,19 82:2
**armed** 46:22
  47:4,11,14 48:8
  73:13,21
**arms** 80:20,21
**arrest** 11:22
  12:13
**arrestable**
  86:13,16
**arrested** 11:16
**arrests** 63:23
**arrival** 60:13
**arrived** 38:20
  39:1 54:22
  76:13
**arriving** 41:6
**article** 18:21
  20:2
**articles** 20:3
  87:19

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

asks 62:11,12

assessment 72:2

assigned 29:20

assist 85:18 86:11

assistant 27:24

assists 85:19

Association 14:19 18:25 22:10

assume 7:25 13:21

assumption 73:19

assumptions 73:16 74:2

attend 26:22

attention 68:21,22

attorney 29:15 58:22

audible 55:22

author 16:9

authorization 28:11 29:2,12

authorized 29:21

availability 20:25

aware 7:10 10:15 48:18,20 55:25

**B**

baby 66:20 68:3

back 14:8 19:18,21,22 22:25 23:20 24:24 28:5,22, 23 54:14 62:7

63:15 72:19 74:6 76:17 81:4,15 82:25 84:1,14 85:11

back-up 59:18

background 23:16 26:15,17 68:18 69:7

bad 16:13 19:14

badge 67:20

Baker 42:13 50:19 58:9 60:8,22 61:8, 16,19,23 62:3, 22 67:25 82:20 83:14,15 84:4

ball 19:11 33:20,21

ballpark 14:4

barges 64:2

bark 19:16 32:4,6,12,18,24 33:6,16,18

barking 32:21

barricaded 57:17 85:24

base 25:11 70:14

based 26:2 33:4 37:2 45:12,17 47:8 52:14 53:9 57:22 60:4 61:7,11 66:2 69:24

basic 14:2 15:6 21:17 22:24 23:22 24:5

basically 20:2 23:3 33:2 60:18 69:6

basis 16:3

Bates 62:10

baton 35:9,10, 19 36:6,23

beautiful 69:21

bedded 31:1

began 39:7

begin 6:9

beginning 21:25 66:14

believed 60:2

believing 70:17 77:2

belly 63:9

belt 34:14,17 35:3 36:5 56:17

big 17:21 48:16 76:23

bike 39:13

birthday 16:25

bit 19:22 24:1 34:2 40:23 43:17 44:4 61:19 63:16 74:6 78:18 79:11 82:13

bite 19:19,20 32:5,11,25 33:10,13,24 43:15,16,18 44:4,12 62:5 75:22

bitten 72:17

black 58:11,12

Bless 62:9

blind 19:7

block 63:16

body 12:25

body-worn 47:10 51:5

bookshelf 30:18

Boone 14:18 24:17

born 16:23

Bornhorn 26:12

bottom 83:1

box 62:13

boxes 62:16 63:21

boyfriend 65:9

break 7:20,22, 24 81:23

breaking 78:18 79:10

briefly 6:13

bring 30:21 74:6

bringing 48:24

broad 87:20

brought 68:21, 22

building 18:20 19:14 50:14

bulletproof 36:1

busy 29:6

bylaws 19:9

**C**

cages 33:19,20

CALEA 14:16

call 10:24 25:5 58:18 59:22 67:3

called 19:5 23:2 28:14,15, 18 31:15 38:22 49:11 59:21 76:10 83:7 85:14,17 86:3, 5,7,10,18 87:7, 15

calls 24:22 86:20 87:6

camera 47:10 51:5

canine 53:9 55:22,25 57:12

58:4 84:23 85:22

Capabilities 41:5

capacity 7:4,8

captain 26:12 27:23

car 14:6 35:11 87:1,7,13

carrier 35:25

carry 34:18 35:3,5,6,10,24, 25 36:1 57:4 58:5

case 6:16 45:18,19 57:19

cases 6:25

catch 23:5 26:19 74:23

catches 31:9, 10

caught 78:14 82:3

certification 19:3 20:11,14 21:3 22:18

certified 18:10, 13,24 19:4 20:13,21 21:6, 24 22:8,12,13, 16,22

certify 20:12, 15

chance 46:15, 16 79:4

change 50:15

changed 32:22

Characterizati on 49:2,18 52:22 53:11,23 79:13

characterize 86:3

characterizing 72:20


The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

charge 25:20 41:6

charged 37:24

checked 62:17 63:21

chief 23:19 27:24

Chief's 14:19

child 31:22 42:14

children 31:25

choice 64:12, 20

Cincinnati 18:16

city 6:24 8:11, 13 29:6,7,11

civilized 52:24

class 15:9,17 38:3,7

classes 14:19 15:10

clear 11:21 12:6 24:5 36:4 45:5 48:6 60:20 61:16 62:1 76:7

click 8:22

clock 27:2

close 31:12

cloth 78:25

clothing 58:12

club 18:14,15 23:1 26:20

co- 85:7

coat 79:10,17

collar 77:15,18

combative 64:22,24

combined 64:1

comfortable 42:1

command 43:15,18,20 44:5,16,22 60:22 61:3,4, 10,12 75:22 77:10,12 78:22 79:25 80:11,16

commanded 74:11 77:15,18

commander 26:13

commands 60:1,7,10,13,17 61:3 62:4,6 74:18 75:9,19

commas 68:6

commercial 40:22 63:24

commercial-rural 64:1

communication 28:21 52:3

compete 23:4

complainant 64:14,16,18 65:6,8 66:11 70:18 71:13

complaint 9:11

complete 83:19

completed 21:17 22:7,14, 15

completely 24:23

completing 70:8

comply 56:11

concept 52:2

concerned 68:2

CONCLUDED 87:25

concurrent 24:6

conduct 12:9

cone 30:20 31:15,16,17 46:3

confidence 22:20

confirm 39:23

confirmed 66:11,17

conforms 56:3

confusing 61:19 70:21,24

considered 13:12 37:6 65:23

consist 19:9

consisted 18:19

consists 14:5 19:23

contact 20:17 37:5 38:9 40:6 48:1 52:4

contained 34:16

containment 41:7

continued 45:4

continuing 15:7

continuous 13:7,9 14:22

control 80:1,2, 8,12,21 81:6,11

conversation 28:24 64:24 82:14

coordinator 26:7

copy 58:21

cord 82:3

cords 77:20,22 78:14,18,23

Corps 13:25

correct 12:11 16:3 34:1 38:23,24 39:8 42:17,18 46:4 48:10 54:18 60:3 62:17 64:6 71:7,16,23,24 72:19 77:20 78:12,15,19 79:5 84:2

correctly 72:20

counsel 58:24, 25 85:8

counter 74:1

county 14:18 24:17 25:4,5,19

COV 59:6 62:10 67:3 71:18

cover 52:3,4

Covington 6:24 7:5 8:11, 13 9:2 26:6 27:8 51:25 55:14 59:6 84:24

create 52:4

crime 12:4 37:6,20 38:9

crimes 12:5

crisis 52:2

crouching 42:17

cruisers 39:4

cu 72:25

current 53:21

cut 14:9 72:10

CV 59:6

**D**

dad 68:3

dad,' 66:20

daily 16:2

danger 54:21 55:2,4,6,8

dangerous 50:18 63:22 77:2

dangerousness 74:3

date 8:17 21:15 28:8 34:2

David 26:8

Davis 6:16 8:19 42:20 58:5 60:3,7 61:9,17, 18,20,23,25 62:3 82:13,14, 16,19 83:15 84:11,13,15,22 85:1

day 21:12,14 23:21 25:1 35:7

days 10:6

de 30:23

de-escalation 51:16 52:1 55:10,18 56:6, 10,14

deadly 34:4 36:20

deal 17:21

dealing 49:5 87:1

decent 15:20

decide 32:21

decision 41:11

decoy 19:14, 16,20,21 26:19 33:12,18

decoying 23:1

decoys 33:19

dedicated 24:23

deeshcalesh 55:18

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

defense 58:24

definition 10:12

definitions 9:7

demeanor 49:6 54:6

department 55:15,21 59:7 84:24

Department's 51:25

depending 12:23 20:3 25:4,13 30:24 50:10 86:25

depends 10:24 20:24 29:6 31:1 53:25

deploy 41:11

deployable 22:21,22

deployed 38:14 52:10 68:23,24 69:10 70:15

deploying 49:12,14 87:12

deployment 28:25 36:9

deposition 6:21 7:7 87:25

describe 23:18 30:16 64:9

description 10:25 58:8,16

detained 11:13,14,15,18 12:2,8 13:6

detainment 11:22,25 12:16

detainments 13:12

determined 10:20

determines

12:12

di 57:3 74:21

died 17:16

difference 9:12,16 11:15 37:3

differently 55:12

direct 6:10 54:11

direction 30:24

disadvantage 46:21

disagree 71:17

disarmed 48:17

disarming 45:17

discovery 29:15

discretion 19:12

discussed 62:21 71:21 84:23

dispatch 28:18,21

dispatched 59:18,20,23

dispute 43:4, 12 44:9

distance 31:8 46:10 52:3

divide 57:25

DOCJT 14:15

documents 58:23

Doe 57:14

dog 18:6,13,25 19:15,17,19,20, 23 20:15,21 21:17,20 22:7, 10,20 23:6,7

24:8 26:18 27:6 30:18,22 32:21 33:18 36:1,2,9, 11,14,25 37:1 38:11,14 45:20 48:24 49:12,14 57:7,15 62:4 80:8,12,13 81:25

dog's 17:4

dogs 23:1,4,21 24:6,15,18 25:3,5,14 26:19 32:19

domestic 9:14

door 19:16 50:3,4,12

dot 66:20,21 68:4

Doug 23:10

downed 19:17

drafted 59:10, 13

drawn 72:19 73:8

drive 31:7 33:5

driver 17:12

drug 15:4

drunk 17:12

due 50:18 76:15

Duke 7:22 16:19,20 17:2, 17 18:6 21:2,16 22:23 28:11,15 31:3,10,14 33:6 38:13,20 41:11 42:6 43:15,17 44:3,12,15,22 45:8,16 46:2,12 50:24 51:1,12 52:9 68:23 69:10 70:15 71:19,25 72:16, 18,25 73:1,7 74:8,11,20 75:13,20 76:1, 4,16,20 78:11,

18 79:15 80:14, 16,17,22 81:18 82:2,13 84:13, 16 85:14,17 86:6,18 87:11, 15

Duke's 28:25 33:9 71:22 76:22

duties 6:24 16:1

duty 34:14,16, 21 36:5 56:17

DVO 9:13 10:7 37:4,5,11 38:12,15 54:15

___

E

e-mail 21:16,21 22:1

ear 65:23 66:1, 8

earlier 37:3 42:12 45:1 52:15 64:11 69:14 74:7,16

early 8:16

east 39:15

education 15:7

effective 52:3

Eldridge 23:10

ellipses 66:20

ellipsis 68:4

else's 16:17 69:4,17

embarrassed 67:9

emergency 9:8,14 10:5

employed 8:10,12

en 73:1

encountered

8:20

end 19:11 28:21 33:9,12, 20,21,22 44:15 61:12 66:11 69:8 75:8

ended 84:16

enforcement 23:15

engage 74:12, 13

engaged 51:1 73:2 74:8,9,20 75:13,17,20,21 84:15

engagement 76:13

engages 33:3

engaging 76:2,4

ensure 40:3

entering 51:14

entire 50:5

environment 63:25

environmental 63:20 64:5

EPO 9:7,12,23 10:5 37:4 49:4

EPO/DVO 66:14

equipment 57:1

Erlanger 24:17 25:19

Ernie 17:5,6,8, 20 22:23 23:24 24:4 38:13

escalation 53:7,19

establish 39:25

established 39:24

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS   Doc #: 37   Filed: 02/20/24   Page: 29 of 42 - Page
ID#: 340
The Deposition of MICHAEL LUSARDI, taken on December 11, 2023
93

**evading** 63:23
86:19

**evening** 59:14
82:17

**eventually**
58:6 61:17

**ex-boyfriend**
66:18

**exact** 68:5
82:23

**EXAMINATIO
N** 6:10

**examples**
86:17

**exchange** 65:7

**exchanged**
64:19,21,23
70:19

**exchanging**
64:22

**exhaust** 55:15

**exhibit** 58:21
59:1

**experiences**
26:3

**explain** 49:9
68:7 72:23

**extended** 10:2

**eyes** 11:17

**eyewitness**
65:14 66:8

**eyewitnesses**
65:22

———

**F**

**face-to-face**
56:11

**fact** 38:7 74:2,3
76:3

**factors** 62:12,
13 64:4,5

**facts** 68:8,17

**fair** 7:25 63:18
72:1

**falls** 36:9

**familiar** 29:16
32:4,15 41:13
48:15 52:6 84:9

**family** 18:4

**fault** 63:16

**fear** 72:5 74:10
75:4

**feared** 73:10

**February** 19:1
21:9,24

**feel** 45:22
50:25

**feet** 73:5

**felony** 37:11,
24 38:1 86:1

**female** 47:6
49:7

**field** 14:4

**fight** 52:25

**figure** 12:18
55:6

**files** 9:11

**finally** 77:14

**find** 20:5 32:5,
24 33:13,24
43:15 49:11
58:13,15 83:17,
22 87:18

**finding** 32:20
44:9

**fine** 20:4 29:10
32:24 36:16
41:9 50:14

**finish** 72:12

**fire** 45:17

**firearm** 34:13,
19 36:8,12,21,
25

**firsthand**
68:16 69:2,15,
19 70:2,22

**fix** 27:5

**flashlight**
56:18,20 64:17
77:4

**fleeing** 37:11,
13 86:19

**flood** 39:5,12,
16

**floors** 50:15

**Florence**
24:18

**foot** 68:24

**force** 34:4
51:17 55:13,19
56:7 59:7,10,16
62:11 68:19
70:12

**forced** 36:20

**forever** 27:12

**form** 28:12
46:19 47:18
49:2 52:22
53:11,24 71:8
78:1 79:13

**formally** 27:15

**Fort** 20:21

**forward** 53:3,
18,20

**fought** 54:4

**found** 43:17
44:4 56:10
58:6,14 61:18,
20 74:9 78:11

**fourth** 67:22

**frame** 43:5

**free** 11:14,25
12:14,17 77:14
78:18 81:23

**freeing** 78:22

**fresh** 24:2

**friend** 64:18
65:7 70:18

**frisked** 12:24

**front** 10:14
50:4,12 72:18
73:7

**FTO** 14:6,11
15:6

**full** 8:5

———

**G**

**gas** 36:1

**gathering** 70:7

**gave** 29:15
36:22 43:3
44:22,24 45:4,
5,12 50:2,4,16,
22,23 52:14
53:13 56:9
58:4,10 60:23
61:3,12 71:10
74:7,18 75:9,
18,22 77:10,12
78:17

**gear** 28:22
35:22

**Generally**
55:13

**Gibson** 6:15

**Gier** 39:2

**give** 6:6 27:4
28:10 41:18,22,
24 42:24 43:15
45:7,14,15,19,
22 46:13,14,15
49:20 50:11,16,
17,23 51:1
58:21 69:7
79:24 86:17

**giving** 31:11
44:15,23 45:21
48:25 49:16
57:12 61:7
80:11

**glad** 10:3

**good** 6:12
18:23 22:9 53:2

**grab** 77:14
80:13

**grabbed** 77:17
79:3

**graduated**
14:3

**grammatical**
68:6

**Grant** 25:4

**granted** 10:6

**grass** 20:3

**Great** 18:15

**green** 18:6,8,
10,13

**grip** 77:16,18

**Griswold** 26:8,
14 27:20,23
28:3,8,10,25

**ground** 63:22
78:7 81:14,17
82:2 84:13,16

**group** 23:11
24:16

**guard** 32:4

**guarding**
32:20

**guess** 9:22
11:7,11 12:24
20:18 25:7 34:9
36:3 61:24 69:5

**Guidelines**
29:16

**gun** 72:19 73:7,
10

**gunfire** 19:18

**guns** 57:6 72:7,
14 87:19

**guy** 19:14
25:23 26:1 46:5
48:16 73:12

**guy's** 31:1
45:12 54:4

**guys** 15:2
23:13 24:18
25:25 30:1

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS   Doc #: 37   Filed: 02/20/24   Page: 30 of 42 - Page
ID#: 341
The Deposition of MICHAEL LUSARDI, taken on December 11, 2023
94

**H**

Ha 63:5

half 16:23 18:6

hammock
42:20 63:4,5
76:20 77:1,19,
22,24 78:11,15,
22 81:23 82:3
84:15

hand 6:4 19:25

handcuffed
12:22 80:5

handcuffs
34:18

handle 24:22

handler 17:2
19:18 27:21
41:5 85:22

handlers
23:13 24:16,20
25:14 27:21

handles 40:12

hands 62:19,
25 63:2,7,9,10,
13,17 74:19,22
75:10,19,23
76:3

hanging 76:21

happened
17:8 68:7

happening
68:9 80:20

hard 31:10
42:6

harder 31:8

he'll 27:4 29:6
30:19 33:18

hear 17:18
79:7,9,11

heard 24:12
30:11 52:12
66:2 68:15

hearing 7:12
10:7

hears 66:1

Heeling 19:24

height 76:15

helped 26:19

helps 74:6

hey 22:8 70:13
76:10

hidden 62:19,
25 63:2,17

hiding 30:23
31:19 33:4
42:10 46:11
47:13 63:24
71:21 72:1 77:3

high 71:20 77:3
86:4

higher 76:16
87:6

highlighted
55:17,24

hill 83:1,2

history 45:12,
17,21 47:8
48:9,23 49:5
53:10,18 62:20,
21 73:13 74:4
87:1

hit 17:11 85:1

hold 32:6,11,
12,18,24 33:7,
16 79:15

holster 79:2

home 18:1
50:3

homes 13:2,3
50:8

hour 19:12
83:12

hours 14:16
18:18,22 22:8,
14 23:9,10,23
24:21 25:9,12
63:22

house 43:24
50:6,12,13

how'd 70:10

huge 50:14

Hulesman
18:17 22:5

human 33:23
52:24

hurry 54:21

hypothetical
53:15

**I**

identical 57:3

IDENTIFICATI
ON 59:1

identified 65:8

ignoring
62:19,25 63:9

immediately
63:13

impact 34:8

improper
69:24

in-between
71:7

in-house 27:8

in-person
14:25 15:1

Inaudible 81:3

incidences
17:13

incident 8:17
28:8 34:2 83:10

incidents 8:15

including
36:23 55:17

Independence
24:17

Indiana 18:24

influence 11:9

informal 24:13

information

52:14 58:13
60:5 69:2,3,16,
17,19 70:1,2,7,
11,22,25 71:5,6
83:17

initial 20:14

initially 61:22

initiate 59:19

ins 23:5

instance 19:8
20:20

instinctive
33:5

intensity 87:6

interstate
17:12

introduced
6:13

invest 67:14

investigating
13:8

investigation
12:9,12 15:4
67:14 70:8,9

investigations
12:3

investigative
12:16 85:21

investigatory
13:10

involved 9:21
40:5 47:16 53:7
86:2

issued 9:9

issues 26:2
27:3

items 35:18
36:12,13,22
56:16

**J**

jacket 79:16

jail 37:22,23

January 17:16
21:5,15,16,23,
24 22:16

jeans 58:11

Jeffersonville
18:24

John 57:13

Jones 39:2
47:6,10 56:24,
25 57:6,22,25
67:18 71:9,13,
14,15 72:7,13,
15 73:2 74:11
80:6,7 81:1,21
82:4

Jones' 58:19
72:6 73:11 82:6

Josh 26:12

judge 9:10,11,
21

June 8:12,16

justification
48:24,25 49:4

justified 49:15

**K**

K9 22:24 23:22
24:5,23 25:10
26:6,9,14 27:6,
9 29:16,20,24
30:2 33:2 34:4
36:20 41:4,5,
13,16,23 44:23,
24 45:13 49:16,
20,22

K9s 30:1

Kelli 54:21
55:1,5,7 65:6

Kenton 24:17
25:19

Kentucky
10:12 13:25
15:4 23:12
37:10

Khadeem 6:15

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

Case: 2:23-cv-00066-DCR-CJS   Doc #: 37   Filed: 02/20/24   Page: 31 of 42 - Page
ID#: 342
The Deposition of MICHAEL LUSARDI, taken on December 11, 2023
95

kick 85:2

kids 9:21

kind 11:7 12:4, 7 14:6 15:2 25:22 26:1 30:20 34:8 40:19 68:9,18 76:20 86:4

kneeling 31:19 71:23

knew 17:20 39:25 57:17,21 65:9 67:25 68:15 73:13,23 75:21 83:13 84:3

knives 36:2

knowledge 6:18 26:3 54:18,19 55:1 69:2,15,20 70:14,22

KYIBRS 67:3, 5,7

**L**

label 58:21

lady 69:22

lang 28:19

language 28:19

late 8:15

law 13:13 23:15 45:18,19

lawful 55:16

laying 42:17 80:6

learn 82:19,22

learned 57:23 83:19

learning 23:5

lease 20:5

leash 19:24 68:24

leave 11:14 12:17 25:6 29:5,11 41:20 46:16

leaving 29:7 37:14

left 19:24 42:2 73:2,3,8 81:18 82:2 83:2

Legally 10:14

length 13:5 46:10

lengthen 13:20

lethal 34:9,11 36:11,13,21,25 54:8

lethals 35:20

letting 32:21

level 9:4 35:25 59:25

Licking 64:2

light 64:25

lights 11:10

lines 66:13

list 36:22

listed 36:10

listening 40:20

locate 19:15 85:18

located 39:10 61:25 84:22

locates 33:3

locating 34:8 85:25

location 8:18, 20,21 45:22 77:4

long 8:24 13:7 16:20 17:6 20:1 21:12 31:1 41:8

longer 24:1

looked 38:2 84:4

loose 14:9

lose 11:18,19 12:7

loss 18:3

lot 27:16 31:7 36:22 86:2

loud 40:18,21, 22

louder 40:23

loudly 7:12

lower 40:23 59:25

Lusardi 6:4,12 8:7,8,14,24 9:7 30:11 34:3 59:10 66:13 85:13 87:23

**M**

Mace 35:1 36:5,23

made 17:21 29:22 55:24

magazines 34:19

make 8:22 40:15 71:2

makes 27:1

male 58:11

MANDO 28:12 38:4 43:6,9 46:19 47:18 49:2,18 52:22 53:11,23 59:2 67:5 71:8 78:1, 3 79:13

March 19:1 21:6,25 22:16

mark 61:16 62:12 66:19

marked 59:1,5 67:3

marks 68:6

mask 36:1

master 19:5,12 20:17

match 49:12 64:8

matter 53:20

Matthews 39:3

meaning 19:7

means 52:1 55:16 60:2

meet 23:11 24:12 25:15

meeting 24:14

memory 16:6 44:3 69:20 74:6,12

mentioned 15:6,11 36:13

mi 68:23

Michael 8:7 38:4 47:19 49:3 52:23

middle 11:5

mile 19:9

mind 38:17 68:20,23 69:9 70:15

mine 41:12 72:5

minimum 57:6

minor 86:5,11

minutes 19:11 20:6 43:3,11 45:1,6 49:24

misdemeanor 37:24 38:3,8

misdemeanors 86:6,11,13

misquoting 69:21

mistakes 71:2

mixed 36:4

mom 40:20

moment 58:1

month 20:16 25:9

monthly 27:17, 22

months 9:25 24:1,3

morning 6:12, 13 8:16

move 19:21 49:22 55:20 59:24 61:15 71:12

multiple 45:24

**N**

Nah 47:3

named 25:20 57:1

NAPWDA 22:10

narcotic 12:3

narcotic- 10:25

narcotics 11:9 18:21,23 20:8 21:10 23:11 30:16,17 85:23 86:12,18

narrative 64:13

nature 35:8 50:18 87:16,17

nearing 51:2

needed 21:20 85:19

Newport 24:18

night 8:15 63:22 83:5

North 18:24 22:10

northern 23:12

Nos 76:22

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

notes 58:18

notified 60:21

number 67:20

NYBIRS 67:16

---

O

O-U-S-T 44:2

obedience 18:19 19:23,24

objection 28:12 43:6 46:19 47:18 49:2,18 52:22 53:11,23 71:8 78:1 79:13

objective 55:16

observation 41:7

observations 16:10

observed 79:14,15

obtained 68:16

OC 34:8,18 35:6

occurred 8:15 84:16

October 14:23

odor 31:2,9,10

odors 30:21

off- 19:23

off-leash 20:5

off-shift 25:3

offense 86:13, 16

office 71:4

officer 7:4 8:25 13:16 14:5 16:2 28:18 29:19 30:11 34:3 38:22 39:2,3 45:18 48:13,15

52:19,25 53:19 54:5 56:23,24, 25 57:5,25 59:9 62:20 63:1,9 65:13 66:13 67:18 70:20 71:9,13,14,15 72:5,6,13,15,18 73:2,7,11 74:11 85:13 87:23

officers 20:25 29:22 34:10 38:20 39:10,13, 14 40:6 46:8 48:10,20 49:6 55:2,3,15 60:19,21 71:1,7 83:24 84:3,7,9 85:16 87:1

official 67:4

ol 26:20

older 25:25

on- 20:4 37:18

on-shift 25:3

one-day 15:16

online 14:17, 25

open-hand 37:2

opened 50:3

opinion 27:4 36:24 37:4,7 56:2 66:7 71:25

opportunity 41:19 51:5 76:12 79:24

options 57:4

order 9:8,14,15 10:5

organization 19:6

oust 43:23,25 44:1,16

outline 68:9

outs 19:20 23:6

oversees 27:4

---

P

P.M. 87:25

packen 43:19 44:8,11

packing 44:22 74:14

pairs 34:18

paragraph 64:13 67:22 72:4 75:6 77:13

pardon 58:2

part 65:12 68:2 76:23

party 9:10,20 71:5

pass 21:2

passed 18:17

past 13:10 45:17 49:5

pat 13:1,2 19:22

path 39:13 71:20

patrol 14:10 21:11,17,20 26:13 41:4

patrolman 23:21

pause 58:2

PD 14:15

people 12:2 25:5 32:11 46:9,15 47:13 51:18 64:22 70:12 86:25 87:1,2

people's 68:21 69:19 70:9

pepper 35:2 36:6,23

perform 21:19

perimeter 39:18,20,21,23 40:4 41:6,8

perimeters 40:6

period 13:10 14:7 35:21 79:24

permission 30:6

person 10:13, 16,19,23 11:25 12:8,14,17 31:19,21 32:2 35:16 37:18 42:17 46:15 55:23 56:20 71:23 73:10,18

personal 6:18 62:13 64:4,7

perspective 27:7

phrases 16:17

physical 37:5, 19 38:9

picked 46:2

picks 31:14

picture 81:13

piece 78:25

pistol 34:20

place 9:24 25:2 39:4 75:3

places 39:18

plate 35:25

played 86:11

point 30:21 45:8 46:24 60:3 62:2 65:1,3 69:8 72:16 73:16 78:9

police 13:15,25 18:25 20:25 22:10 26:21 48:10 49:6 51:25 53:7,10 55:14,16,24

59:6 84:24

policies 29:14

policy 29:15 41:3 51:24,25 52:7 55:14,21, 25 56:3

portion 68:11

pose 52:6 53:3

posed 52:15, 16

poses 52:20

posing 37:19

position 11:8 74:22

positive 13:14 15:18

positively 65:8

Possibly 47:12

pounds 48:16

power 28:5

practice 10:22

practices 10:15

precinct 84:1

prepared 27:18

presence 51:14 59:17 60:19,21

pretty 7:19 50:2 59:24 76:24

Previously 36:19

prior 17:2 22:23 28:10 29:1,11 30:9 42:21 44:4 45:13 48:9,23 49:24 51:14 52:9 53:8,9,18 55:24 56:7 60:13,25 62:4 74:4

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202



Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

**probable** 11:18,24 12:7, 12

**problem** 7:20 35:8

**PROCEEDINGS** 6:1

**process** 6:24 23:9

**professionals** 23:3

**proficiency** 27:17

**program** 26:7

**program's** 14:1

**progress** 12:5

**proper** 56:14

**proportionality** 52:2

**protect** 34:10

**protection** 9:8, 15 19:16

**protective** 10:5 35:18

**provided** 58:24

**proximity** 30:12,15 31:3, 5,11,18

**prying** 35:24

**PS** 68:23 69:10 71:19 74:11,20 75:13

**PSC** 70:15

**PSD** 75:20 77:14,15

**pull** 11:6

**pulled** 41:3 71:25 78:24 79:20 80:8 84:13

**pulling** 42:6 71:20,22

**pulls** 31:7,10

**punching** 37:2

**purpose** 39:17,19 41:16 46:14 75:15 86:23

**purposes** 12:2

**put** 11:7 33:19, 21 41:4 68:10 69:7 77:23

**putting** 68:8,18

——— **Q** ———

**qualified** 21:19

**quarter** 19:9

**question** 7:13, 14,21,25 16:14 43:14 47:15 62:3 65:24 68:25

**questions** 6:17 7:24 8:2 57:25 87:22

**quick** 59:15 65:12 79:8

**quotation** 66:19 68:5,6

——— **R** ———

**radio** 25:7 28:14 34:19

**raise** 6:4

**reach** 85:16

**reached** 79:2

**read** 55:12 56:4 64:8 66:22,25 69:25 70:12 74:10 75:3 77:8

**reader** 70:17, 21

**reading** 68:15 70:3

**reads** 30:5

**ready** 21:5

**real** 15:18 51:20

**reason** 42:6 43:12 45:11 59:17 73:11 78:17

**reasonable** 55:16

**reasons** 49:14, 15

**recall** 29:1 46:13 47:20,23 48:3,5

**received** 29:14 68:18 69:3

**recognition** 52:2

**record** 6:3 8:6 56:4 85:7,10,11

**ree** 79:1

**reengage** 79:1

**reengaged** 79:2 80:9

**referring** 8:17 42:5 49:23 51:24 62:25

**refresh** 74:12

**region** 20:18

**regulations** 9:18

**related** 11:1

**release** 34:4 36:14,20 37:2 38:12 43:20 44:16 53:9 57:14 77:10,12, 15,18 78:21 79:25 80:11,14, 15

**released** 14:9 38:11 55:22

**releases** 80:13

**releasing** 37:1 45:20 55:24

**reliability** 65:17

**reliable** 66:8

**remember** 15:2,15,22 44:15 51:7,8,9 57:21 58:19 76:17 83:3,25

**reminds** 40:20

**renewed** 10:2

**repeat** 7:13

**rephrase** 7:15

**replied** 68:1

**report** 15:8,13 16:9,17 27:17 42:2,9,16 44:21 58:19 59:7,11 60:4 62:11 64:11 67:4,11 68:7,9,10,12, 15,16 69:4,13, 15,17 70:1,18, 21 77:11 83:4, 11,13,19

**REPORTER** 6:3,9 40:15 85:11

**reporting** 59:9 71:9

**reports** 15:24 16:2,5,6,8 58:14 59:16 69:6,18

**repositioning** 52:5

**represent** 6:16

**request** 29:20, 22,24

**requesting** 29:19

**required** 29:2 30:9

**reread** 69:22

**residents** 46:4

**resistant** 59:25

**resisting** 84:11

**resorting** 55:19 56:7

**respected** 48:16

**respond** 60:8, 9,14 61:14

**responded** 62:7 80:17

**responding** 60:1,7,9 61:2,8, 9 62:2,4,6

**responsibilities** 52:4

**responsibility** 40:2,3

**rest** 77:8

**retired** 17:14, 16 21:1

**retirement** 13:21

**return** 19:18,22

**review** 51:5

**Richmond** 14:1,17

**rip** 79:8

**River** 64:2

**Rizzo's** 8:19 39:5,14

**role** 26:24 85:20,21 86:11 87:20

**roles** 85:22

**room** 19:15

**route** 83:22

**rule** 7:11

**run** 20:4 85:4

**rural** 63:24

**rush** 55:7

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

**S**

safe 57:5

safely 34:10

safety 27:3 72:6 73:11 74:11

scenarios 85:23

scene 37:11, 13,14,16,19 38:20 40:3,8,10 54:22 61:13 64:9 70:11 84:1,8,10 85:16

scent 30:20 31:14,16,17 46:3

schedule 24:25

school 21:17 23:22 24:5

Schutzhund 18:15 23:2 26:18 32:23

scuffle 52:19

Sean 6:16 8:19 60:3,7 61:9,17, 18,20,23 62:3 83:15

search 19:14 20:2 50:5,8 85:21

searched 12:25 13:3 56:9

searches 18:20,21

seconds 14:8

section 63:20

sector 29:20

sees 27:4

seizures 13:12

self- 59:18

self-initiate

85:15

self-initiated 59:21

sen 25:25

send 19:20 25:6 27:22

sends 27:23

seniority 25:25

sentence 66:14

September 14:24

Sergeant 26:8, 14 27:22 28:3, 7,10,25

service 24:22 86:21

serving 86:22

set 6:17 39:21 40:4,6,8 41:6,8

sets 9:21

severity 36:9

Shaun 42:13 43:4 45:2,7 50:19 58:8 60:8,21,22 61:8,16,19,22, 23 62:3,22 77:24 80:20 81:14,17 83:14, 15

Shaun's 81:19 82:1

shift 14:5,7,8 27:25 28:3,4

shining 64:17

shirt 58:11

shoot 46:22

short 46:10

shot 17:9 73:14

shotgun-style 50:13

show 23:4 58:20 63:8,10, 13 74:19,22 75:9,19 76:3

showed 76:5

showing 77:4

sic 44:20,22 51:1 60:1 67:16 68:23

side 39:15

signals 20:1

signs 9:11

sir 9:16,19 10:19 52:7 55:25 63:6 66:12 67:11 68:7 70:6 71:12,18 72:11 75:8 78:5

sit 19:19 56:13

sitting 20:1

situation 12:23 50:10 54:1 57:16 86:4 87:17

situational 62:12,13

situations 47:13 52:5 86:12

sleep 77:24

sleeping 42:20 58:6 78:15

sleeve 79:16 80:9

slowing 52:5

sneezes 62:8

sniff 30:19

soft 40:18

sole 38:14

solely 53:9

solemnly 6:5

solo 14:9

someone's 68:14

sound 38:3

source 70:3

speak 7:11 65:4 82:16 85:7

specific 41:21 47:23

split 21:11

sport 23:2 26:18 32:23,24

spray 35:2 36:6,23 47:25 67:23,25

spreading 31:2

stamped 62:10

standard 41:25 57:2

standards 22:21

standing 31:19 42:17 46:12 50:24 71:23 72:17 73:1

start 34:1

started 6:14 8:3 17:17 22:25 59:22

starts 64:14 67:22 70:15 72:5 75:9

state 8:5 77:12

stated 42:5 64:16

statement 63:18 64:24 69:25

station 82:25

stay 19:19

stealth 63:23

Steep 63:22

stomach 81:14,16,17

82:2

stop 52:21 54:5 86:24

stops 12:3 86:1,22

story 17:11

straight 80:23

street 11:1,5 14:9 39:6,16

strike 37:2

stuff 11:11 12:5 27:2,3,5 45:18 57:17 61:13 63:10 64:3 68:8,17,21 82:6 85:25 86:1,2 87:3,19

subject 10:17 30:23 31:13 32:20 33:3,24 41:18 44:4 45:9 51:13 52:9 64:16,19 65:7 70:19 74:20 75:13,20

subject's 45:17 65:8

subjects 53:18 85:24

submit 43:11 44:7

successfully 21:16 22:14

sufficient 50:5

suggestions 27:5

summarize 12:7

supervisor 14:6 26:9,11 29:2,12,21,24

supposed 55:5

surface 19:10

surgery 17:15, 22

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

surrender 46:15

suspect 13:6
39:8 46:13,17
47:17 48:1
50:24 51:1,2
57:12 60:1,11
72:18 74:19,21
75:9,19,24
76:2,9 77:2
80:3 81:6 86:19

suspects 56:8
61:11

suspicious
10:13,16,18,20

swear 6:5

switching 34:2

———————

T

table 7:21
54:20

tactfully 11:7

tactical 52:5

taking 20:21
58:1

talk 8:14 16:19
44:14 47:1
54:23 55:9

talked 12:20
37:3 42:12 49:6
55:10 56:16
64:11 65:14
69:13

talking 8:18,
20,21 9:6 28:18
42:3 44:25
51:18 60:3
61:17,18 74:16
84:7 87:10

tall 76:24 77:6

taller 76:19

tangled 77:19,
22

taser 34:7,22,
25 35:6 36:5,23

tasers 57:7

team 21:20
29:20

tearing 79:8,9

techniques
11:11 51:17,19
52:1 55:11,18
56:6,14

telling 42:7
51:10

tells 31:11

temporary
13:9

ten 17:7 23:13
24:20 30:24
45:15

tend 7:22

tent 42:2,19,20,
25 45:1,4,6
49:23 50:22,23
56:3 58:5 61:10
63:3

tents 45:24
50:17

term 41:13
64:21

terminologies
32:9

terminology
9:5 32:14

terrain 63:23

test 6:19 19:3,4
20:13 82:11

testified 81:1

testify 81:5
82:5

testimony 6:5
65:15 66:2
79:23 84:20

there'd 87:14

thick 42:10
76:24

things 26:2
36:24 55:11

thought 17:20
42:9 46:12
52:15 57:19
62:3

threads 79:10

threat 37:5,19
52:6,16,20
53:4,20 54:11

threatened
48:4

threatening
48:8

three-minute
20:1

throw 33:21

thrown 87:19

tied 25:7

time 13:1,6,20
14:7,21 15:21
22:15,16,17
24:10 25:1,21
28:21 36:15
43:3,4,5 44:15
51:13 52:4 64:9
66:12,18 69:18
76:13 79:11,24
80:1,12,21
82:23 83:21
84:22 86:12

times 48:12
85:23,24 86:10,
17

timing 43:12

titled 18:7

today 6:17
8:14 20:15
47:22 51:3,10
56:13 59:16

told 47:2,10,15,
23,25 48:4,7,8
57:22 61:4,22
65:10 69:16
70:19 71:5,13
74:13 80:14
83:24

Tom 18:17
22:5,12 23:9,15

Tom's 25:1

tomorrow
20:20

tools 34:7,9
35:24 36:10

top 39:4,12
71:19 77:23
79:20 83:2

topics 15:2

tops 76:21

tourniquet
34:20

tr 23:13

track 19:8,11
30:16,22 31:25
33:20,21,22
39:7 45:3
46:10,11

tracking 18:20
41:4 56:22,23
85:24

trackings 33:9

traffic 12:3
30:20 52:21
86:22,24

train 18:19
23:3 24:7,15,16
25:2,9,12,18
26:19 33:6

trained 15:23
16:1 23:10 24:6
31:4 32:20
33:16,17 41:21
50:2 51:16
57:11

trainer 19:13
27:8

trainers 19:6
20:18

training 13:22
14:3,5,14,15,22
15:5,7,11,13
18:9,12,19
21:21 22:14,19,
24 23:1,9
24:13,15,20,21,
23 25:2,10,21

26:4 27:12,16
33:5,12 41:23
65:13 66:5
80:16

trainings
26:22,25 65:13

trains 24:16

transports
64:2

tree 33:19

trees 76:21

trial 51:4

trick 6:19

trouble 7:12

true 44:21

truth 6:6,7

turn 59:5 62:9
67:2

turns 19:10,24,
25

TV 40:21

type 15:12
35:1,9 41:22
47:2 53:8 58:8
86:13,15,20
87:16,17

———————

U

Uh-huh 32:7
35:23 50:9
65:19 79:19

ultimately
46:23

underlined
55:17,23

understand
7:14 44:12
49:13 65:1
81:13 82:1

understanding
9:6,22 10:4,5,
10 29:10 30:7
60:12 67:17,19
69:6 84:14
85:14,17

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202


THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

**understood** 7:25 42:6 56:13

**unit** 26:6

**units** 41:6

**Unstable** 63:22

**untangling** 79:1 80:15

**Utilization** 29:16

_____

**V**

**vegetation** 20:4 42:10 71:20 76:16,19, 24 77:3,6

**vehicle** 35:14, 19 36:5 56:17

**vendor** 18:17 22:6

**verbal** 19:25

**verbatim** 16:16,17

**verbiage** 39:8 64:12,21

**Verona** 18:16

**vers** 83:14

**versus** 9:14 31:19 32:5 64:24 66:2 68:16 85:21

**vests** 36:1

**victim** 49:7 55:5

**video** 43:2 44:8 51:3,9 76:17 77:11 79:5,12

**viewed** 49:10 51:9

**views** 27:6 69:8

**Vincent** 8:7

**violation** 37:4,

10,25 38:12,14 49:5

**violence** 9:14 48:9,13 62:20, 21

**violent** 11:1,6 12:4 48:1,7 73:12

**visible** 63:18

**voice** 40:16 65:8 66:19 68:3

**volume** 41:22

_____

**W**

**walked** 50:3

**walking** 77:4,6

**wall** 39:5,12,16

**Walton** 23:20

**wand** 35:9

**wanted** 20:15 46:22

**warning** 49:1 55:22

**warrant** 54:4, 15,17 86:21

**warrants** 86:22

**Washington** 6:11,15 28:16 38:6 40:18 41:1 43:7,10 46:25 47:21 49:8,21 53:1,14 54:2,9, 13 59:3,4 67:7, 10 71:11 78:2, 4,8 79:19,22 85:6,12 87:21

**watched** 79:7, 12

**watches** 27:2, 3

**watching** 40:21

**Water** 63:24

**Wayne** 20:21

**ways** 11:2

**weapon** 34:8 47:2,16

**weapons** 12:25

**wear** 34:14

**Wednesday** 23:12 24:13 25:12,16

**Wednesdays** 25:3,13

**week** 14:23,24 20:16 23:14 24:22

**weekly** 26:22, 24

**weeks** 14:2,4 23:22

**west** 39:15

**When's** 14:21

**white** 58:11

**whoever's** 40:5

**wind** 30:24

**witnesses** 39:19 65:18,23

**wo** 6:23

**woods** 47:14 68:1

**word** 12:24 44:8,11

**words** 16:9,17 51:8 57:13 64:19,20,21,22, 23 65:7 70:19 86:4

**work** 13:20 19:16 21:11 22:18 23:5,14 24:22 25:15 28:1,3,20 30:19,22 40:19 83:7

**worked** 23:21 26:18

**working** 17:17 18:25 21:19 22:10 23:6 27:6 28:2,8 30:2

**works** 28:4

**worthy** 53:8

**would've** 60:22 76:20

**write** 16:2,5,8 67:11

**writing** 15:8,13 60:4 64:11 69:14

**written** 16:10 67:18

**wrong** 71:1

**wrote** 22:1 59:14 69:15 83:4,11

_____

**Y**

**yards** 30:25 45:16

**ye** 19:1

**year** 9:25 14:16,24 16:23 20:12 23:25

**yearly** 14:15

**years** 9:1 10:1 13:16 17:7 23:7 32:19 66:21 68:4

**Yoshi** 23:8

**young** 69:22

The Ohio Reporting Company
312 Walnut St, Suite 1600
Cincinnati, OH 45202

THE OHIO
REPORTING COMPANY
YOUR PATH THROUGH LITIGATION

Phone: 1-866-800-7031
Fax: 502-584-0119
schedule@yourdepos.com
www.yourdepos.com

# KYIBRS REPORT: NARRATIVE

## COMMONWEALTH OF KENTUCKY

## SYNOPSIS:

## INVESTIGATION:

On 06/09/2022 at approximately 0129 hrs, I was dispatched to the area of 1564 Water Street at Rizzo's Painting for a male that was allegedly stalking his ex-girlfriend.

Upon arrival, I made contact with Mrs. Spray and her friend Mr. McKee which were standing in front of Rizzo's. Spray stated that her and McKee were inside of their tent in the area when they saw a flashlight in the area. She stated that they asked the person shining their flashlight if they were camping there and they heard a very familiar voice of which Spray stated was her ex-boyfriend Shaun Baker. She became extremely nervous as she has a DVO against him from previous violence. McKee grabbed his flashlight and began to shine it back at the person until they could leave the area. The person continued to shine there flashlight back at him until they left.

Spray reported to officers that Baker had just gotten out of prison for Assaulting an Officer here in Covington. She further stated that he had disarmed an officer and was extremely violent toward Police Officers. She stated they she was 100 percent sure that it was Bakers voice that she heard, when asked if she was sure again, she stated that she was with him for years and knows his voice.

I confirmed with Kenton County Dispatch that the DVO was active and verified the conditions of the DVO. Which was no contact, not to be within 500' of the victim.

Due to the history of Baker with violence towards Police Officers and others a K-9 was requested and responded.

During the track of Baker, a male in a hammock, matching the description and in the exact area of which Spray stated he was in was located and apprehended by PSD. The male, Mr. Davis was found to be the male that was flashing lights at the complaint and had no history with Spray.

Davis was transported to the St. Elizabeth Covington ER for treatment and was released without being cited.

Neither Spray or McKee had telephone numbers for officers.

There is body cam footage of this incident.

## ATTACHMENTS:

## METHODS OF OPERATION:

Date _____

Exhibit ____| 
Michael Lusardi
Date 12-14-2023

## KYIBRS REPORT: NARRATIVE

### COMMONWEALTH OF KENTUCKY

### *SYNOPSIS:*

Officers were dispatched for a possible EPO/DVO violation.

### *INVESTIGATION:*

On 06/09/2022 at approximately 0129 hrs, I was dispatched to the area of 1564 Water Street at Rizzo's Painting for a male that was allegedly stalking his ex-girlfriend.

Upon arrival, I made contact with Kellimarie Spray and her friend Richard McKee, who were standing in front of Rizzo's. Spray approached and said, "I have an active EPO with a baby dad that's tried to kill me twice, and he's hiding right near my tent down there."

Spray stated that she stays in the woods along the Licking River, approximately 200 meters from the parking lot of Rizzo's Painting and encountered a subject whom she stated was her ex-boyfriend, Shaun Baker. Spray alleged that her and McKee were in the woods, in the area of their tent, when they saw a flashlight in the area. They began to shine their light back towards the flashlight and Spray stated she heard a voice that she positively identified as Baker.

I asked Spray if she knew Baker was int he woods and she replied, "Yeah, it's his voice, I know my baby dad...I was with him for 8 years". McKee stated, "You could tell he was crouched down and everything". Spray continued, "He had that light so bright, I know his voice. I couldn't see him, I just know he's down there". She became extremely nervous as she has a DVO against him from previous violence. McKee grabbed his flashlight and began to shine it back at the person until they could leave the area. The subject continued to shine there flashlight back at him until they left.

Spray reported to officers that Baker had just gotten out of prison for assaulting an officer in Covington. She further stated that he had disarmed an officer and was extremely violent toward police officers. She once again verified that she was sure that it was Baker's voice that she heard, when asked if she was sure again, she stated that she was with him for years and knows his voice.

Both Spray and McKee stated that the male was approximatley 100 yards past the "water tower". They further stated he was "barely into the woods." Officer Gier asked Spray if she actually saw Baker and she replied, "It's his voice, I was with him for eight years and when he spoke back to him, I told him, 'That's Shaun'." Spray described Baker as approximately 5'09", 160 to 180 pounds with shoulder length brown hair.

I confirmed with Kenton County Dispatch that the DVO was active and verified the conditions of the DVO, which was no contact and not to be within 500' of Spray.

Due to the history of Baker with violence towards police officers and others, a K-9 was requested and responded. I briefed Officer M. Lusardi of the situation and informed him that Spray was alleging that Baker was hiding in the woords near her tent.

During the track of Baker, a male, who was later identifed as Sean Davis, was located in a hammock, in the area Spray stated she encountered Baker. Through further investigation, it was determined that Davis was actually the subject Spray and McKee had encountered in the woods.

Just before we made contact with Davis, officers located Spray's tent, approximately 50 meters from where

## KYIBRS REPORT: NARRATIVE

COMMONWEALTH OF KENTUCKY

Davis was located.

Davis was transported to the St. Elizabeth-Covington for treatment and was released without being cited.

Neither Spray or McKee had telephone numbers for officers.

There is body cam footage of this incident.

*ATTACHMENTS:*

*METHODS OF OPERATION:*

# Covington Police Department
## Use of Force Report

| Report Number: 22-024772 | Date: 06/09/2022 | Time: 0148 (approximate) |
|---|---|---|

**Reporting Officer: Lusardi ID #0216**

| Location of Incident: 1564 Water Street Covington Ky 41011 | Location Type: Woods |
|---|---|

Nature of Original Call: Suspicious Person/EPO Violation

| Reason for Presence: Back-up dispatched | Primary Assignment at Time of Incident: Uniform Marked Car |
|---|---|
| Force Used Against: Person | Reason Forced Used: To Effect Arrest  To Defend Self  To Protect Other Officers |
| Initial Reason For Contact: Locate and Arrest Subject | Number of Other Officers Present at time force used: 1 |
| Supervisor Notified (name): Sgt. Griswold | Time Notified: 0150 (approximate) |

Name of Subject: Davis, Sean M
Address: 305 Pleasure Isle Drive          City: Erlanger          State: KY
Zip: 41018

| Gender: Male     Race: White     DOB: ▮▮▮▮ | Height: 5'10"  Weight: 150 lbs  Build: average |
|---|---|

Subject Arrested: Yes ☐     If yes List All Charges:
No: ☒     If no explain: General Incident

Subject Under the Influence of: Alcohol ☐   Drugs ☐   Suspected ☐

Mental Illness ☐   (Attach CIT Report)   Unable to Determine ☒

Types of Restraints Used : Handcuffs                    Checked for fit and double locked: Yes ☒     No ☐
Secondary Type of Restraints Used: N/A          If no is checked, explain:

If injuries were incurred during police contact, including any officers and other persons, provide the information below: If additional space is required, please include a separate attachment to this form.

| Injury Type | Name of Person Injured | EMS or Hospital Treating | Injuries Occurred During: |
|---|---|---|---|
| Laceration to Left Triceps | Sean Davis | St. Elizabeth Covington | Making Arrest |
| | | | <select> |
| | | | <select> |
| | | | <select> |

(If any injured party refuses treatment, type "refused" in hospital block)

| Photos taken of suspect by: Gier          ID # 0281 | Photos taken of Officers by: Gier          ID # 0281 |
|---|---|

Photos taken of scene: Yes ☒ No ☐   by: Gier   ID # 0281

Video of Event: Yes ☒,          Yes but by an Officer that is not the author or this report ☐, (other Officer ID(s) # _____ )
If yes type: Dash camera ☐  Body camera ☒          No ☐ If no, reason must be given in narrative of report

**Levels of Resistance by Suspect (mark all that apply)**

- ☒ Not responding to commands
- ☐ Verbal Defiance
- ☐ Dead weight/Refusing to move
- ☐ Pulling Away

- ☐ Fleeing or evading
- ☐ Displays aggression
- ☐ Spitting at/on Officer
- ☐ Pushing/Shoving of Officer
- ☐ Wrestling with Officer
- ☐ Striking or kicking Officer

- ☐ Weapons Used or Threatened to be Used
- ☐ Attempting to Disarm Officer
- ☐ Chokes Officer
- ☐ Life threatening weaponless assault
- ☐ Active Shooter
- ☐ Actual or attempted vehicular assault

Type of Actions  Used: K-9   Type of Actions Used: N/A   Other: N/A

Were Actions Effective: Yes ☒   No ☐   Somewhat/limited ☐   if limited explain:

Effects of Actions Used on Suspect: Minor Injury Requiring Outpatient Treatment     if other explain:

Effects of Actions Used on Officers: No visible injury/no complaint of pain

Subject Armed:          If Armed, Check Weapon Type:
Yes ☐ No ☒          Knife ☐  Club ☐   Firearm ☐
          Other: Describe

Weapons Indicators (mark all that apply)
- ☐ Brandished          ☐ Suspected
- ☐ Concealed          ☐ Displayed
- ☐ Visible          ☐ Reported
- ☐ Other

# Covington Police Department
## Use of Force Report

**Situational Factors (mark all that apply):**

**Personal**

- ☐ Body size disparity
- ☐ Physical condition of suspect
- ☐ 1000 yard stare
- ☐ Target glancing
- ☐ Scanning the area
- ☐ Verbalization of harm
- ☐ Repetitive phrases
- ☐ Sudden attack
- ☐ Known/perceived fighting skills
- ☐ Clenching (hands, teeth, jaw)
- ☐ Illogical responses
- ☐ Multiple subjects
- ☐ Weight shifting
- ☐ Personal grooming behaviors
- ☐ Removing hat, watch, shirt, shoes
- ☐ Crossing of arms
- ☐ Hands above waistline
- ☐ Bladed boxer or martial arts stance
- ☒ Hands hidden
- ☒ Ignoring the Officer
- ☐ Gang tattoos
- ☒ History of Violence

**Environmental**

- ☒ Unstable ground
- ☒ Night hours
- ☐ Winter/snow/ice conditions
- ☐ Extreme heat
- ☐ Raining
- ☒ Steep or dangerous terrain
- ☒ Evading arrest by stealth
- ☐ Evading arrest by fleeing
- ☒ Evading arrest by hiding
- ☐ Presence of bystanders
- ☐ Residential area
- ☒ Commercial area
- ☐ Industrial/warehouse area
- ☐ Urban area
- ☒ Rural or remote area
- ☒ Water environment
- ☐ Involvement of speed/vehicles
- ☐ Riot/mob/disorderly crowd
- ☐ Involvement of heights
- ☐ Physical exhaustion
- ☐ Injury to Officer
- ☐ Inability to disengage

- ☐ Lack of backup
- ☐ Officer on the ground
- ☐ Rapidly evolving situation
- ☐ Subject pulling away
- ☐ Universal precautions
- ☐ Close proximity to weapons
- ☐ Multiple subjects
- ☐ Inability to call for assistance
- ☐ Armed subjects

**Roadway/street (check all that apply if actions took place on road surface)**

- ☐ Heavy traffic
- ☐ Speed limit 25-44 mph
- ☐ Speed limit 45 mph or higher
- ☐ Limited access/divided highway
- ☐ Four lanes or greater
- ☐ City Street
- ☐ Alley

## Narrative of Incident

Narrative Instructions – The narrative should reflect the incident as a chronological account of facts and relevant events that occurred and resulted in the use of force. If there are any other sources of information (CAD logs, printouts, etc), attach the additional information to this form. Specific supplementary report forms need to be completed and attached to this report if taser, strikes, chemical agents, firearms, or any other projectiles are used.

I responded to listed location to assist officers looking for a wanted suspect. I met officers at 1564 Water Street, where they were speaking with the complainant. I was advised the complainant was being stalked by her ex-boyfriend, Shaun Baker, who she has an active EPO/DVO against.

The complainant stated she was at her camp site in the woods along the Licking River when her and her friend encountered a subject. The complainant stated the subject had a flashlight and was shining it towards her. The complainant and her friend exchanged words with the subject and the complainant positively identified the subject's voice as her ex-boyfriend. The complainant confirmed a second time that it was her ex-boyfriend, saying, "Yeah, it's his voice, I know my baby dad...I was with him for eight years."

Dispatch advised the complainant has an active EPO/DVO against the suspect with a caution for fighting with police and attempting to disarm police.

With this in mind, I deployed PSD Duke on a 15 foot leash attached to a harness. The complainant gave officers the last known area she observed the suspect and our team started towards that direction. The wind was in our face and PSD Duke picked up a scent and we went north along the woodline, near the Licking River. PSD Duke turned into the woods and down a path. PSD Duke approached two tents in the location where the complainant stated she had been camping. I gave loud announcements identifying myself as a Covington Police K-9. I heard no response from anyone in the area so we cleared the tents and moved north along the path.

# Covington Police Department
## Use of Force Report

PSD Duke went off the path, through high vegetation, pulling as though someone was hiding in the immediate area. PSD Duke was at the end of the 15 foot tracking line when I felt the line go tight. I thought the suspect was hiding in the thick vegetation where PSD Duke was working. PSD Duke showed a lot of interest in the area and because of PSD Duke's behavior, I believed PSD Duke was standing on the suspect.

In fear for mine and Officer Jones' safety, I commanded PSD Duke to engage. I gave commands for the suspect to show his hands even though I couldn't see exactly where PSD Duke had engaged the suspect. As I shined my flashlight towards PSD Duke's direction, I observed what I believed was a tarp attached to a tree. As I was approaching PSD Duke, it was unknown where the suspect was or if he was armed or not. The tarp that I observed was actually hammock hanging between two trees.

Due to the height vegetation, I could not determine if PSD Duke had a hold of the suspect or the hammock. As I got closer, I observed PSD Duke had a hold of the suspect wrapped up in the hammock. I gave the suspect commands to show his hands and to get on the ground. As the suspect fell out of the hammock and onto the ground, I commanded him to lay on his stomach. PSD Duke had a hold of the left jacket sleeve of the suspect. As the suspect lay on his stomach, PSD Duke pulled the jacket sleeve off of the jacket and Officer Jones attempted to place the suspect in handcuffs.

I attempted to grab PSD Duke by the collar, as he had the sleeve of the jacket in his mouth. As I reached for PSD Duke's collar, I became stuck in the thick vegetation and my holster became tangled on the hammock cords. As I was breaking free of the cords, PSD Duke bit the suspect's left triceps.

I was finally able to free myself and grab PSD Duke by the collar. I commanded PSD Duke to release his grip. PSD Duke followed commands and we stepped back from the suspect while Officer Jones finished placing him in handcuffs.

Covington Fire and EMS arrived at the scene and treated the suspect's injuries. The suspect was transported to St. Elizabeth Covington for further medical attention.

*The below signed officer is required to file this report and retains all the rights provided to him/her by Garrity v. New Jersey, 385 US. 493 (1967).*

_____ 0216

**Reporting Officer Signature and ID**

**Other Officers**

*Use of Force RPT-20211115*

Retention 5 years COV000015    3