UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| SEAN DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2: 23-066-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CITY OF COVINGTON, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Sean Davis filed a civil rights complaint on May 12, 2023.  [Record No. 1]  His Complaint asserts multiple causes of action against Defendants City of Covington, Kentucky ("Covington") and Covington Police Officer Michael Lusardi[1] arising under federal and state law stemming from an incident that occurred on June 8, 2022.  Davis contends that, during the incident, Lusardi directed his police canine to bite Davis, resulting in injuries.

There are three motions current pending for review.  Davis has moved to dismiss the Covington pursuant to Rule 21 of the Federal Rules of Civil Procedure.  [Record No. 30]  Next, Lusardi has moved to strike portions of the reports and/or limit the testimony of Davis's proposed experts, Dr. Michael Lyman and Brad Smith.  [Record No. 33]  Finally, Lusardi has moved for summary judgment, asserting qualified immunity under federal law and qualified official immunity under state law.  [Record No. 34]

---

[1]     Defendant Lusardi is being sued both individually and in his official capacity.  [Record No. 1, ¶ 4]

- 1 -

Following careful review, the Court will grant Davis's motion to dismiss Covington as a defendant.  The Court also will dismiss Does 1–10, who have not been identified.  Next, Lusardi's motion for summary judgment will be granted, in part, and denied, in part.  And finally, his motion to strike or limit expert opinions and testimony will also be granted, in part, and denied, in part.

**I.**

At approximately 1:24 a.m. on the morning of June 9, 2022, Kenton County Emergency Communications ("Dispatch") received a call from Richard McKee, reporting that his girlfriend, Kellimarie Spray, was being stalked by her ex-boyfriend, Shaun Baker.  [Record No. 41-2, p. 6]  Dispatch sent Covington Police Officers Ryan Jones and Jacob Gier[2]  to the area of 1564 Water Street to contact McKee and Spray.[3]  [*Id.*]  Upon their arrival, Spray advised Officer Jones that she had been living in a tent in the woods approximately 200 meters from their location.  [Record No. 34-1, p. 4]  Spray reported that she and McKee were near the tent when they noticed someone in the woods with a flashlight.  [*Id.*]  McKee noted that, when they shined their flashlight towards the individual, they could tell that the person was crouching.  [*Id.*]  Spray stated that she could hear the person's voice, despite acknowledging that she could not see the individual.  [*Id.*]  Spray offered the officers multiple assurances that she could positively identify Baker, noting, "[y]eah, it's his voice, I know my baby dad . . . I was with him for 8 years."  [*Id.*]

---

[2]      In the Call for Service Detailed Report, [Record No. 41-2], unit numbers "3C21," "3C25," and "3C92" refer to Officers Jones, Gier, and Lusardi, respectively.  [*Id.* at 8–9]

[3]      The parties incorrectly refer to the dispatch location as "1563 Walter Street."  [Record Nos. 34, 41]

Spray described Baker as being approximately 5' 9" tall, weighing 160 to 180 pounds, and having shoulder-length brown hair. [*Id.*] She advised the officers that Baker had twice before attempted to kill her and that there was an active emergency protection order ("EPO")[4] issued against him. [*Id.*] She also cautioned that Baker (i) was extremely violent towards police officers; (ii) had previously disarmed a police officer and: (iii) had just been released from prison for assaulting a police officer in Covington. [*Id.*]

Officer Jones reports that he confirmed the existence of an active DVO, which instructed Baker to have no contact with Spray and to remain 500 feet away from her at all times. [*Id.*] He also indicates that he requested the assistance of a canine officer due to Baker's history of violence towards police and others. [*Id.*] At approximately 1:35 a.m., Lusardi and another Covington officer[5] indicated that they were enroute to the scene. [Record No. 41-2, p. 6] Lusardi's body-worn camera ("BWC") footage depicts him on-scene with his canine (Duke) at approximately 1:41 a.m. [Record No. 34-2, at 01:40:35][6] Officer Jones reports briefing Lusardi on the situation, Baker's background, and Spray's belief that Baker was hiding in the woods nearby. [Record No. 34-1, p. 4]

---

[4]    In Kentucky, a domestic violence order ("DVO") is issued after an evidentiary hearing "if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur." Ky. Rev. Stat. 403.740(1). An emergency protection order ("EPO") is issued for the time leading up to the evidentiary hearing if the court concludes that there is "an immediate and present danger of domestic violence and abuse." Ky. Rev. Stat. 403.730(2)(a).

[5]    The Call for Service Detailed Report shows Covington Police Officer Mathews, "2C70", going enroute to the scene at 1:36 a.m. [Record No. 41-2, p. 5]

[6]    All pinpoint citations refer to the time of day as represented by the BWC's timestamp, rather than a corresponding amount of time into the video exhibit.

Officer Jones, Lusardi, and Duke began moving along a wooded area and Duke began to track at approximately 1:42 a.m. [*See* Record No. 34-2, at 01:42:40.] The track led the group down a path into the woods and directly to Spray's makeshift campsite containing two tents and various other items. [*Id.* at 01:44:28] At approximately 1:45 a.m., Lusardi stood outside of the tents and identified himself as "Covington Police, you in the tent, come out now." [*Id.* at 01:45:07] A few seconds later he added "Police K-9, come out of that tent." [*Id.* at 01:45:11] Following no response, Lusardi peered into the tents and found them to be empty. The group then continued down a path and away from the area of the tents until Duke led them off the trail. [*Id.* at 01:46:47] Lusardi noted in his deposition that Duke began to pull hard on his leash—an indication to Lusardi that someone was in the area. [Record No. 37, pp. 10, 42]

At approximately 1:47 a.m., BWC footage depicts Duke approaching what is now known to have been Davis in a hammock. [Record No. 34-2, at 01:47:08] Lusardi's flashlight can be seen illuminating foliage partially obstructing the hammock from view. [*Id.*; Record No. 41-1] With the area illuminated and Davis out of view but within his hammock, the BWC picks up what appears to be an utterance from Davis. [Record No. 34-2, at 01:47:10] Lusardi's Use of Force Report describes his response as, "[i]n fear for mine and Officer Jones' safety, I commanded [Duke] to engage." [Record No. 37, p. 42] The BWC's audio captures Lusardi issuing two loud commands to Duke,[7] at which point Duke can be seen engaging Davis in his hammock. [Record No. 34-2, at 01:47:11] Lusardi did not announce his presence, issue any

---

[7]     The command being issued is Duke's bite command. In his deposition, Lusardi reports that Duke's bite command is, "packen," and his release command is "[aus]". [Record No. 37, p. 13] *Cf. Jarvela v. Washtenaw County*, 40 F.4th 761, 764 (6th Cir. 2022) (describing "packen" as "a command meaning 'grip' or 'apprehend' in German").

commands to Davis, or warn of his intent to release Duke immediately preceding his commands for Duke to engage.[8]

The BWC footage shows that Duke's engagement was immediately met by Davis yelling out and repeatedly calling for help.[9]  [Record No. 34-2, at 01:47:13]  At the same time, Lusardi can be seen moving closer to the hammock while issuing a third bite command.  [*Id.* at 01:47:16]  Once Lusardi is sufficiently close to see Davis directly,[10] he orders: "[s]how me your hands now, dude . . . show me your hands!"  [*Id.* at 01:47:19]  BWC footage then depicts Davis present his free hand and declare, "I didn't do anything," while Duke continues to engage his left arm.  [*Id.* at 01:47:25]

Officer Jones and Lusardi then pull Davis from his hammock and command him to lie on his stomach and place his hands behind his back.  [*Id.* at 01:47:27]  With Davis lying prone on the ground, Officer Jones is briefly observed attempting to grab Davis's right arm while Duke continues to bite and pull on his left arm.[11]  [*Id.* at 01:47:33]  Throughout this process, Davis continues to ask, "What did I do wrong?"  [*Id.* at 01:47:35–:39]  Duke's continued pulling rips the left sleeve from Davis's jacket.  [*Id.* at 01:47:42]  At this point, Duke can be seen reengaging Davis's exposed left arm.  [*Id.* at 01:47:49]  As this occurs, Davis can be heard yelling in pain and asking why he is being attacked.  [*Id.* at 01:47:55]  Lusardi's Use of Force

---

[8]     Lusardi argues that his previous announcement around the tents was sufficient warning to those in the area and conformed with applicable departmental policy.  [*See* Record No. 37, p. 16.]

[9]     It is unclear from the BWC footage if Duke is biting/pulling on Davis's left arm or solely has hold of his jacket's sleeve.

[10]     Davis describes himself, in stark contrast to Baker, as "a slight, blue-eyed man." [Record No. 41, p. 2]

[11]     *See supra*, note 9.

Report indicates that he attempted to grab Duke by the collar prior to Davis's sleeve being pulled off but his holster became snagged on the hammock chords.  [Record No. 37, p. 42] Lusardi can be heard giving Duke the command to release, although the video footage does not show what is happening.  [Record No. 34-2, at 01:48:08]  A few seconds later, Davis again yells out in pain [*Id.* at 01:48:11] before Lusardi can be heard patting Duke [*Id.* at 01:48:14]. It is unclear from the BWC footage the exact point at which Davis was fully handcuffed or the point at which Duke released Davis's arm.  However, at approximately 1:48 a.m., one of the officers asks Davis for his name, which he provides.   [*Id.* at 01:48:25] Minutes later, an ambulance was requested, and a handcuffed Davis can be seen being walked away from the woods.  [*See id.* at 01:50:20; Record No. 41-2, p. 5.]

After being assessed by EMS, Covington Police transported the handcuffed Davis to Covington's St. Elizabeth Hospital.  [Record Nos. 41, p. 4; 41-2, p. 3]  Davis received stitches for some of the bite injuries to his left bicep and tricep, was directed to follow up for suture removal, and was referred to an orthopedic practice.  [Record Nos. 41-6; 41-7]  He was discharged from the hospital and was not charged with a crime.  [Record No. 41]

Davis filed his Complaint on May 12, 2023, alleging violations of his rights under federal and state law.  [Record No. 1]  An Amended Complaint was filed on May 15, 2023.  It contains allegations of: (1) violations of the Fourth and Fourteenth Amendments brought under § 1983; (2) supervisor liability/*Monell* against the City of Covington; (3) state law negligence; (4) state law assault and battery; and (5) state law intentional infliction of emotional distress. [Record No. 4] Davis thereafter moved to dismiss the City of Covington as a defendant pursuant to Rule 21 of the Federal Rules of Civil Procedure.  [Record No. 30]  Lusardi has

moved to strike or limit portions of the opinions and testimony of Davis's proposed experts. [Record No. 33] And on February 20, 2024, Lusardi moved for summary judgment on the basis of qualified immunity. [Record No. 34]

## II.

Rule 21 of the Federal Rules of Civil Procedure permits the Court, "on motion or on its own," to add or drop a party from an action. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." (citation omitted)). Having concluded that Covington is a dispensable party, Davis's motion will be granted. [*See* Record No. 30.] Additionally, the Court will dismiss *sua sponte* Defendant Does 1–10, who have not been identified.

## III.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute regarding any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once this showing is made, the burden shifts to the nonmovant. The nonmoving party must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). In other words, the nonmoving party must present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. Mar. 6, 2018) (citation and alteration omitted).

The Court affords all reasonable inferences and construes the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, a dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, the Court may not weigh the evidence or make credibility determinations but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## IV.

Lusardi seeks to invoke the doctrine of qualified immunity as well as Kentucky's doctrine of qualified official immunity as a shield him against all of Davis's claims. [Record No. 34] Once a defendant raises qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to it. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

At the summary judgment stage, qualified immunity can be defeated one of two ways. First, a plaintiff can overcome qualified immunity by offering "sufficient evidence to create a genuine issue of fact, that is, evidence on which a jury could reasonably find for the plaintiff." *Gardner v. Evans*, 811 F.3d 843, 846 (6th Cir. 2016) (quoting *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015) (quotations omitted); *see also Bagley v. Guillen*, 90 F.4th 799, 800 (5th Cir. 2024) ("[T]o the extent that any material fact dispute remains after viewing the facts in light of the available video evidence, the court should deny summary judgment on

grounds of qualified immunity.").  Second, if no dispute of material fact exists, a plaintiff may

demonstrate that the defendant is not entitled to qualified immunity as a matter of law.  Despite

similarities, different legal standards apply to federal qualified immunity and qualified official

immunity under Kentucky law.

### A.

Under federal law, "[t]he doctrine of qualified immunity insulates public officials from

liability under 42 U.S.C. § 1983 unless the caselaw existing at the time of their actions clearly

established that they violated the Constitution."  *Lawler v. Hardeman County*, 93 F.4th 919,

921 (6th Cir. 2024).  Analysis of this defense follows a two-step process.  The first step requires

the Court "to determine if the facts alleged make out a violation of a constitutional right."

*Shumate v. City of Adrian*, 44 F.4th 427, 439 (6th Cir. 2022) (citing *Pearson v. Callahan*, 555

U.S. 223, 232 (2009)).  The second step looks to whether "the constitutional right was clearly

established at the time of the alleged violation."  *Id.* (citing *Wright v. City of Euclid*, 962 F.3d

852, 864 (6th Cir. 2020)).  The Court can address these requirements in either order, and if the

plaintiff fails to carry his burden as to either one, the other need not be addressed.  *See*

*Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Pearson*, 555 U.S. at 236).

### 1.

Davis's first claim under § 1983 contends that Lusardi used unreasonable force against

him while affecting an unlawful arrest.  "When assessing the force used by an officer during

the course of an arrest, [courts] look to the Fourth Amendment."  *Saalim v. Walmart, Inc.*, 97

F.4th 995, 1003 (6th Cir. 2024) (citing *Godawa v. Byrd*, 798 F.3d 457, 463–64 (6th Cir. 2015)).

And although an arrest "necessarily carries with it the right to use some degree of physical

coercion . . . this use of force must be reasonable, which is judged by an objective standard." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)) (quotations omitted). "[T]he inquiry is not whether *any* force was justified, but 'whether the officer could reasonably use the *degree* of force' that was employed." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (quoting *Roell v. Hamilton County*, 870 F.3d 471, 483 (6th Cir. 2017)) (cleaned up).

**i.**

The Supreme Court in *Graham* articulated three factors to help determine whether an officer's use of force during an arrest or investigatory stop was reasonable. They are: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Saalim*, 97 F.4th at 1003 (quoting *Graham*, 490 U.S. at 396–97). These factors assist in determining whether an officer's use of force "was objectively reasonable under the 'totality of the circumstances.'" *Id.* (quoting *Palma v. Johns*, 27 F.4th 419, 428–29 (6th Cir. 2022)).

This standard requires that the Court to assess the attendant circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013). "It allows for the fact that 'police officers are often forced to make split-second judgments' about the amount of force necessary 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Raimey v. City of Niles*, 77 F.4th 441, 451 (6th Cir. 2023) (quoting *Mullins v. Cyranek*, 805 F.3d 760 766–67 (6th Cir. 2015)).

- 10 -

**ii.**

For a right to be "clearly established" at the time of the alleged violation, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curium)). The Sixth Circuit has adopted the practice of looking "to decisions of the Supreme Court, then to [Sixth Circuit] precedents, and then to decisions of other courts of appeal," before asking "whether these precedents 'placed the . . . constitutional question beyond debate.'" *Wright*, 962 F.3d at 869 (quoting *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013); *see also Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024) ("Nonbinding opinions are never enough to clearly establish a point of law.").

**2.**

Davis contends that Lusardi used unreasonable force on the following three occasions: (1) when he forcibly removed Davis from the hammock prior to issuing a warning; (2) when he used Duke to remove Davis from the hammock; and (3) when he permitted Duke to continue biting despite Davis being restrained and compliant. [Record No. 41, p. 6] The Court "evaluate[s] the legality of each use of force at the moment that the Officer[] engaged in it." *Gambrel v. Knox County*, 25 F.4th 391, 400–01 (6th Cir. 2022) (citing *County of Los Angeles v. Mendez*, 581 U.S. 420, 429 (2017)).

**i.**

The first use of force occurred when Lusardi forcibly removed Davis from the hammock without any direct warnings. [Record No. 41, p. 6] The BWC footage leaves no dispute regarding the relevant facts. Thus, this issue can be resolved as a matter of law.

- 11 -

The Court notes at the second step of the qualified immunity inquiry that Davis cites only one case to demonstrate that Lusardi was on notice that his conduct was wrongful.  And while he relies on *Ashford v. Raby*, 951 F.3d 798 (6th Cir. 2020), that his reliance is misplaced.  In *Ashford*, the Sixth Circuit concluded that an officer's conduct was *not* unreasonable.  The opinion does not define the constitutional boundary beyond which force *is* unreasonable.  Instead, it merely affirms the lawfulness of the conduct used by the officer under the circumstances presented.  Relying on a case that validates the use of force as a benchmark for unreasonableness is both logically unsound and legally insufficient.  Reasonableness is assessed through a highly contextualized lens, which explains why the doctrine of qualified immunity requires that a right be clearly established in a "particularized" sense, and not in broad or abstract terms.  *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Without a more analogous precedent that clearly defines the actions taken by Lusardi as unlawful, Davis has failed to carry his burden.  Accordingly, there is no need to examine the reasonableness of the conduct itself.  Lusardi is entitled to qualified immunity with respect to this first use of force.

### ii.

Next, Davis argues that Lusardi's decision to use Duke to drag him from his hammock was unreasonable under clearly established precedent.  In addition to the BWC footage ruling out factual disputes, Davis himself asserts that the material issues are undisputed.  [*See* Record No. 41, p. 12.]  And as a matter of law, Lusardi is entitled to qualified immunity regarding this use of force because Davis has again failed to carry his burden of demonstrating that Lusardi's conduct was clearly established as having been unlawful.

In addition to citing *Ashford*, Davis relies on three other cases in support of his argument: *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994), *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988), and *Campbell v. City of Springboro*, 700 F.3d 779, (6th Cir. 2012). *Matthews* and *Robinette*, however, suffer from the same flaw as *Ashford*: they identify examples of force deemed reasonable while offering no meaningful notice to officers as to what constitutes unreasonable force. Reliance on *Campbell* fails as well, but for different reasons.

The district court's decision to deny summary judgment in *Campbell* was premised largely on the existence of factual disputes making summary judgment inappropriate. *See Campbell*, 700 F.3d at 787 (noting that the parties disputed whether warnings were given). But even if that were not so, the facts of *Campbell* are significantly dissimilar and would not be sufficient to put Lusardi on notice that his conduct was clearly established as unlawful.

*Campbell* concerned two separate biting incidents involving the same police canine. In one incident, "the officers did not know the extent of the crime, if any, that [the arrestee] had committed," and the canine handler stated that he "was not aware of a specific threat to anyone at the time." *Id.* The arrestee alleged that he was laying down with his arms at his side and that he made eye contact with the officer prior to the canine biting. Moreover, the canine acted independently, engaging without the officer ever issuing a command to do so. *Id.*; *Campbell v. City of Springboro*, 788 F. Supp. 2d 637, 655 (S.D. Ohio 2011).

The second incident involved an 18-year-old, 110 lb. woman arrested for underage drinking who subsequently escaped from the back of an officer's police vehicle. *Campbell*, 788 F. Supp. 2d at 656. The officer knew only that "she was intoxicated, possibly was still handcuffed, that she was very belligerent," and that she was willing to resist arrest and flee.

*Id.* at 658 (quotations omitted).  The officer did not have reason to suspect that the individual was a physical threat in either incident.

The Sixth Circuit's opinion noted that "there is ample evidence to suggest" that the officer in question acted "contrary to clearly established law when he used an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing." *Campbell*, 700 F.3d at 789.  *Campbell* and the instant case are hardly analogous.

Here, there is no indication that Duke was inadequately trained or that he had a history of acting independently of Lusardi's commands.  The most significant distinction however pertains to the officers' subjective threat assessments.  In *Campbell*, the officer admitted that he did not know that either arrestee was a threat to his safety.  Conversely, Lusardi believed Davis to be a violent criminal with a history of resisting arrest and disarming police.  And he had reason to believe that Davis was stalking his ex-girlfriend in violation of an active DVO.  Given these material differences, *Campbell* does not sufficiently place Lusardi on notice that his actions were unlawful.  Therefore, he is entitled to qualified immunity regarding the second use of force.

### iii.

Davis also alleges that, by permitting Duke to bite him while he was already restrained, Lusardi's third use of force was unreasonable under clearly established precedent.  The parties dispute the factual basis of this allegation.  Davis alleges that the BWC footage supports his contention that Duke was actively biting him for one minute and four seconds, and that for forty-three seconds of that time he was "subdued on the ground with an officer's foot on his

back."[12]  [Record No. 41, p. 13]  Lusardi similarly relies on the video to conclude that, "[a]t

maximum, Plaintiff was bit, while on his belly, . . . for a period of 21 seconds," and that prior

to that, "Duke [was] merely ripping the arm of [Davis]'s jacket."  [Record No. 43, p. 5]  In

addition to the parties' recollections of the event, the Court views the facts "in the light

depicted by the videotape," resolving any factual disputes that are "utterly discredited."  *See*

*Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

At 01:47:33 in the BWC footage, Davis can be seen lying prone on the ground with

Officer Jones attempting to grab his right arm while Duke bites and pulls on his left arm.[13]

[*See* Record No. 34-2.] At 01:48:14, Lusardi can be heard patting Duke and it appears evident

that he has released his bite.  [*Id.*]  But several things are unclear regarding the critical forty-

one second period, despite the BWC footage.  They include: (1) whether Davis is "restrained"

for all (or merely some) of this time;[14] (2) how long Duke is biting Davis and for how much

of that time he is only biting Davis's jacket sleeve; (3) whether Davis fully complied with

Officer Jones' attempt to secure his right arm;[15] and (4) whether, as Davis contends, an officer

---

[12]      In his deposition, Davis accuses Lusardi of letting Duke continue to bite him after he "was
down, subdued, cuffed." [Record No. 36, p. 96]
[13]      *See supra*, note 9.

[14]      Is one "restrained" only once handcuffs have been secured?  During his deposition
testimony, Lusardi notes that Davis was not under control during the relevant period, stating, "he
wasn't handcuffed or anything like that. So he was laying there. . . . Jones was trying to get him
under control." [*See* Record No. 37, p. 22.] Lusardi also notes that Davis never resisted. [*Id.* at
23]

[15]      Lusardi testified that he was unsure what Davis was doing with his right arm while Officer
Jones was attempting to gain control of him because Lusardi was trying "to break free of the
hammock" at that time.  [*See* Record No. 37, p. 22.]

- 15 -

was holding him down with a foot on his back.  For purposes of summary judgment, the Court construes this factual uncertainty in favor of the nonmoving party.

When the legal question of qualified immunity "turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Akima v. Peca*, 85 F.4th 416, 426 (6th Cir. 2023) (quoting *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012)) (quotations omitted).  Therefore, summary judgment is not appropriate where the evidence "viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *King v. City of Rockford*, 97 F.4th 379, 390 (6th Cir. 2024) (quoting *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013)).  Upon review of the evidence presented regarding the third biting incident, the undersigned concludes that there are genuine disputes of material fact that preclude summary judgment based of qualified immunity.

### 3.

Davis also brings a Fourteenth Amendment deliberate indifference claim under § 1983. More specifically, he alleges that Lusardi failed to provide Davis with timely medical attention. Lusardi denies the allegation and counters that he is entitled to qualified immunity and summary judgment.

"[T]he Fourteenth Amendment imposes on the government an affirmative duty to provide medical care to all those it takes into its custody, regardless of the person's precise legal status."  *Colson v. City of Alcoa*, 37 F.4th 1182, 1187 (6th Cir. 2022) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).  An arrestee is only

entitled to relief if he can show that the officer acted with "deliberate indifference to his serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This requires an objective and subjective showing. An arrestee can meet the objective requirement by showing an injury "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). Under the subjective test, an arrestee must show that "(1) an official was aware of facts from which [he] could have inferred a substantial risk of serious harm to the suspect, (2) [the official] in fact drew such an inference, and (3) [he] nevertheless disregarded the known risk." *Hicks v. Scott*, 958 F.3d 421, 438 (6th Cir. 2020).

Davis can satisfy the objective injury requirement as well as the first two elements of the subjective test. As Davis correctly observes, "The operative question, therefore, is whether Defendant Lusardi also intentionally and recklessly delayed Mr. Davis's access to medical care after causing [his] injuries." But the record clearly demonstrates that he did not. An ambulance was called for Davis approximately two minutes after he was secured in handcuffs. [*See* Record Nos. 34-2 at 01:50:20; 41-2, p. 5.] When Davis was walked out of the woods in handcuffs, he was in the custody of Officer Jones, not Lusardi.

Due to the lack of factual support, Lusardi is entitled to summary judgment regarding Davis's Fourteenth Amendment deliberate indifference claim in both his individual and official capacities. Even if Davis could show that his access to more definitive care was delayed, the claim fails against Lusardi because he was not Davis's custodian. No reasonable jury could conclude that Lusardi acted with deliberate indifference regarding Davis's serious

medical needs.  Therefore, this claim against Lusardi (both individually and in his official capacity) will be dismissed in its entirety.

## B.

Under Kentucky law, qualified official immunity shields a police officer sued in his or her individual capacity from tort liability resulting from his negligent performance of: (1) discretionary acts,[16] (2) made in good faith, (3) and within the scope of his or her authority. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  Bad faith is "the opposite of good faith," and it "can be predicated on a violation of a constitutional, statutory, or other *clearly established right* which a person . . . presumptuously would have known was afforded to a person in the plaintiff's position."  *Rowan County v. Sloas*, 210 S.W.3d 469, 483 (Ky. 2006) (first quoting *Black's Law Dictionary* 176 (rev. 4th ed. 1968); and then citing *Yanero*, 65 S.W.3d at 523) (cleaned up).

"When federal qualified immunity and state-law immunity 'rest on the same questions of material fact, [the Court] may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'"  *Raimey*, 77 F.4th at 451 (quoting *Wright*, 962 F.3d at 878).  In this case, the material facts in dispute speak directly to the possibility of bad faith, regardless of whether those facts are premised on Davis's Fourth Amendment claim or his state-law claims.  As a result, Lusardi's motion for summary judgment will be denied regarding the state law claims.

---

[16]     Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Yanero*, 65 S.W.3d at 522.  Conversely, a ministerial act is "one that requires only obedience to the orders of others, or when the [official]'s duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.*

**V.**

The Court now turns to Lusardi's motion to strike or limit the opinions and testimony of Davis's proposed experts, Dr. Michael Lyman and Brad Smith.  [Record No. 33]

**A.**

Dr. Lyman has been retained to testify regarding "whether the use of force was consistent with industry standards, best practices and procedures, police supervision and management, police policies, written directives and general orders, and other similarly related matters."  [Record No. 19]  Lusardi's first objection is general in nature.  He contends that Lyman is not "an expert in the use of force through the use of a K9 and appropriate K9 practices," and that he should not be permitted to offer testimony "specifically regarding K9 practices."  [Record No. 33, p. 5]  The objection will be sustained, in part.

Under Rule 702 of the Federal Rules of Evidence, a witness qualified as an expert "by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

While courts permit experts to testify about discrete police-practice issues, such as "use of force," sweeping statements that report generalized non-specific education and training do not satisfy the burden of demonstrating expertise on a discrete topic.  *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908–09 (6th Cir. 2004).  "Formal education is not always necessary to qualify an expert; practical skill and experience may suffice."  *United States v.*

- 19 -

*Diaz*, 25 F.3d 392, 394 (6th Cir. 1994); *see Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (noting that a beekeeper without scientific training can serve as an expert on bumblebee behavior if his testimony is based on extensive firsthand observations and a proper foundation is laid). However, practical skill and experience must still be specific to the topic on which the expert intends to opine. *See Champion*, 380 F.3d at 907 (noting that "police policies and practices" is too broad a field for one to qualify as an expert).

While Lyman is qualified as a use-of-force expert, his expertise does not extend into more specialized matters of K-9 training, handling, practices, or tactics. Therefore, his testimony in these more focused areas exceeds his established expertise and does not meet the criteria set forth under Rule 702. However, Lyman may offer testimony on use-of-force principles, including the relative placement of K-9 deployment within the use-of-force continuum and any related considerations. To the extent that a K-9 is deployed as a use of force, it is not unlike the deployment of baton or a TASER, and Dr. Lyman is qualified to opine on such issues.[17]

The undersigned provides an example to better illustrate this point. Dr. Lyman's Expert Report discusses "professional literature on law enforcement canines," describes two common deployment methods, then concludes that "Officer Lusardi utilized the 'bark and hold' method

---

[17]   For example, an expert in general use-of-force principles with *no* TASER-specific training or knowledge, can still discuss generally applicable use-of-force considerations including a TASER's place in the use-of-force continuum. That same expert, *with* the proper TASER-specific knowledge base, is likely qualified to discuss deployment considerations unique to a TASER— preferred target area, environmental considerations, contraindications of use, number and duration of activations, etc. These considerations are not static among all uses of force, they require some form of specialized knowledge of a TASER's use. Similarly, an engineer qualified to discuss the innerworkings of a TASER is likely not qualified to testify as an expert on the body's physiological response to being incapacitated by a TASER.

with his K-9." [Record No. 33-1, pp. 11–12] These and similar statements fall outside the permissible scope of his testimony without first demonstrating the basis for his knowledge in this discrete area. Conversely, the Report's discussion of departmental policy and IACP Guidelines is not improper because it speaks directly to K-9 deployment as a use of force and its place within the use-of-force continuum. [*See id.*]

## 1.

In addition to the generalized objection discussed above, Lusardi also challenges the four opinions contained within Dr. Lyman's Report. The first opinion states that "[t]he arrest of Sean Davis by Covington Police Officer Michael Lusardi was without justification because it lacked the requisite probable cause for a proper arrest." [*Id.* at 7] Lusardi contends that this statement constitutes an impermissible legal conclusion and, therefore, should be excluded. [Record No. 33, p. 6]

When factual disputes relevant to probable cause exist, "those issues must be submitted to a jury for the jury to determine the appropriate facts." *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005). However, the legal sufficiency of these facts to establish probable cause is a question of law for the Court to decide. *Id.* In this case, Lyman's opinion does not offer the jury assistance in resolving any factual disputes, it merely provides a legal conclusion. This exceeds the scope of testimony permissible under the Federal Rules of Evidence. *See* Fed. R. Evid. 702 (requiring that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue"); Fed. R. Evid. 401 (stating that evidence is relevant only if "it has any tendency to make a fact more or less probable than it would be without the evidence"). By offering legal conclusions regarding the existence of probable cause or the justification of

Davis's arrest, the Report impermissibly veers into legal analysis that is reserved for the Court. As such, the objection to this aspect of Lyman's testimony will be sustained and this opinion will be excluded.

### 2.

The second challenged opinion states that "[t]The K-9 deployment by Covington Police Officer Michael Lusardi against Sean Davis constituted a high level of force that was improper, excessive and unnecessary under the totality of the circumstances." [Record No. 33-1, p. 8] Lusardi contends that this assertion constitutes impermissible legal conclusions.

Lyman may provide insight on the range of force options available to law enforcement and the general considerations an officer evaluates when deciding the appropriate level of force to use. However, he must refrain from using terms that implicate a legal standard (e.g., "totality of the circumstances", "objectively reasonable"); express a legal conclusion (e.g., "*excessive* force", "*unlawful* arrest", etc.); or otherwise "invade[] the province of the Court. *See Berry*, 25 F.3d at 1353 ("Although an expert's opinion may 'embrace an ultimate issue to be decided by the trier of fact,' Fed. R. Evid. 704(a), the issue embraced must be a factual one.").

In addition, discussion of specific case law or constitutional principles falls outside the scope of an expert's testimony and will be excluded.

### 3.

Only relevant evidence is admissible under Rule 402 of the Federal Rules of Evidence. Because the Court will dismiss Davis's Fourteenth Amendment claim, any evidence exclusively supporting this claim is devoid of probative value with respect to the remaining

legal issues.  Dr. Lyman's opinion on this topic will be stricken and any testimony addressing the Fourteenth Amendment claim will be excluded.

**4.**

The fourth challenged opinion states that, "[b]ased on BWC video evidence in this case, Covington Police officers involved with the arrest of Sean Davis knowingly and improperly disengaged or otherwise, turned off their body worn cameras periodically during critical interactions with Mr. Davis." [Record No. 33-1, p. 15]  Lusardi contends that this is irrelevant and that any probative value would be outweighed by unfair prejudice.

Even if the scope of Dr. Lyman's opinion and testimony were narrowed from "Covington Police officers" to encompass Lusardi's actions alone, it would still be excluded under Rules 401, 403, and 702.  Davis's response to the instant motion notes that the "Defendant's decision to turn off his body cam audio . . . is highly probative to Mr. Davis's constitutional claims."  [Record No. 40, p. 13] Further, the "Defendant's failures to follow applicable industry standards and guidelines for his body cam constitute one (of many) acts of negligence . . . ."  [*Id.*]

First, Lusardi's conduct is not bound by IACP guidelines or any other industry best practice, but by department policy.  Dr. Lyman's opinion does not address whether Lusardi's BWC use complied with the policies of the Covington Police Department or even mention Lusardi by name.   Furthermore, Lusardi does not set policy for the Covington Police

Department, so defending the wisdom of the department's BWC policies is not his cross to bear.[18]

But even if Davis's argument were accepted, he fails to explain why this should be introduced by his use-of-force expert, who concludes that the conduct is "unprofessional." [Record No. 33-1, p. 16] Expert testimony is necessary only when scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702. The question of whether Lusardi's BWC was turned on or off intentionally, even if highly relevant, is more appropriately resolved by a review of the BWC footage itself or through direct testimony from Lusardi.

The Report does not identify how this opinion is probative of any factual inquiry, including those raised in a negligence claim. Lusardi does not breach his duty to Davis by not complying with IACP guidelines, even if they reflect best industry practice. In the absence of any probative value to introducing this opinion, it only serves to unfairly prejudice Lusardi as subjectively, "unprofessional." Lusardi's objection will be sustained and this opinion will be excluded.

### B.

Brad Smith also has been retained by Davis to testify regarding "whether the use of force was consistent with industry standards, best practices and procedures, and other similarly related matters." [Record No. 19] He is the owner of Canine Tactical Operations and Consulting and has previously served as an expert witness regarding "K9 tactical searches,

---

[18]     The Court acknowledges that this opinion may have been tailored to address Davis's *Monell* claim against the City of Covington, prior to dismissing it as a defendant. [*See* Record No. 4, p. 6.]

training and use of force." [Record No. 33-2]  He offers three expert opinions in this case, and Lusardi objects to each one.

Smith first states that "K9 Officer Lusardi acted unreasonably and not within his department K9 policy.  K9 Officer Lusardi's actions were not consistent with K9 industry standards, best practices, training and case law." [*Id.* at 4]  Lusardi argues that this opinion regarding reasonableness reaches the case's ultimate question and constitutes a legal conclusion.  He raises the same argument with respect to Smith's second opinion that "The use of Duke as an apprehension tool was unreasonable and not consistent with the totality of the circumstances as well as K9 industry standards, best practices, departmental policy and case law." [*Id.* at 11]

The objection to these opinions will be sustained, and Smith will be precluded from testifying regarding the "reasonableness" of Lusardi's actions.  Such proposed testimony would encroach on the jury's role in determining the ultimate issue of the case.  Similarly, Smith will be prohibited from citing case law, appropriating legal standards, and articulating legal conclusions. *See supra*, Section V.A.2.

Smith's third opinion is that "[t]he two bites Mr. Davis received from Duke were not consistent with K9 industry standards, general police and K9 best practices and standard of care because Mr. Davis committed no crime, Mr. Davis was not a threat and Mr. Davis was not fleeing or resisting."  Lusardi notes that this opinion makes explicit reference to the standards outlined in *Graham v. Connor*, suggesting it too reaches a legal conclusion.  This objection will be sustained for the reasons noted above.

**VI.**

Based upon the foregoing analysis and conclusion, it is hereby **ORDERED** as follows:

1.      Plaintiff Davis's Motion to Dismiss Defendant City of Covington pursuant to Rule 21 of the Federal Rules of Civil Procedure [Record No. 30] is **GRANTED.**  Does 1–10 are similarly dismissed from this action.

2.      Defendant Lusardi's Motion for Summary Judgment [Record No. 34] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order.

3.      Defendant Lusardi's Motion to Strike or Limit expert opinions and testimony [Record No. 33] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order.

Dated: May 13, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky